699 P.2d 908

**Bill Ross CREAMER,**
**Plaintiff/Appellant,**

v.

**Michael S. RAFFETY, Jean Raffety, Huey Lee Morris, Ruth Ann Morris and City of Willcox, Defendants/Appellees.**

**No. 2 CA–CIV 4981.**

Court of Appeals of Arizona,
Division 2.

Dec. 27, 1984.

Review Denied March 26, 1985.

Gentry, Desens & Behrens by Tony K. Behrens, Bisbee, for plaintiff/appellant.

Mesch, Clark & Rosenthal, P.C. by Tom R. Clark, Tucson, for defendants/appellees Raffety and Morris.

Fish, Briney, Duffield, Miller, Young & Adamson, P.C. by K. Alexander Hobson, Tucson, for defendant/appellee City of Willcox.

HATHAWAY, Judge.

Plaintiff's lawsuit alleged his arrest to be in violation of his constitutional rights pursuant to 42 U.S.C. § 1983, and raised claims of false arrest, false imprisonment, and malicious prosecution. The court granted the defendants' motion for summary judgment on the plaintiff's claim for malicious prosecution, and plaintiff was granted leave to file an amended complaint. The amended complaint sought damages based on claims of false imprisonment (Count One), failure of defendants to inform plaintiff of the conditions for release or bail (Count Three), delay in bringing the plaintiff before a magistrate (Count Five), intentional infliction of emotional distress

(Count Seven), and invasion of privacy resulting from a strip search (Count Nine). Each of these counts also alleged that the defendants' conduct was grossly negligent, in reckless disregard of plaintiff's rights, or intentional, and sought punitive as well as compensatory damages. The complaint further alleged as to each of these claims that the actions of the defendants deprived him of his constitutional rights, pursuant to 42 U.S.C. § 1983 (Counts Two, Four, Six, Eight and Ten). Plaintiff also sought, under 42 U.S.C. § 1983, to enjoin the City of Willcox from enforcing its strip search policy (Count Eleven). Plaintiff challenges on appeal defendants' entitlement to judgment as a matter of law on the malicious prosecution claim and the entry of a directed verdict for defendants on the other counts. We affirm in part and reverse in part.

Since on this appeal we are considering the propriety of the entry of summary judgment against the plaintiff, we consider the record in the view most favorable to the plaintiff, *Livingston v. Citizens Utility, Inc.*, 107 Ariz. 62, 481 P.2d 855 (1971). Further, in connection with the granting of the directed verdict against the plaintiff, we are guided by the rule that if the evidence is of such a character that reasonable minds may differ on conclusions or inferences to be drawn therefrom, the motion for directed verdict must be denied. *Bailey v. Montgomery Ward and Company*, 6 Ariz.App. 213, 431 P.2d 108 (1967). Thus, viewing the record in the light most favorable to reversal, the following scenario evolves.

On January 28, 1980, the plaintiff, Bill Ross Creamer, and his friend, John Stoddard, met in the City of Willcox and proceeded in Stoddard's automobile to the Silver Bullet Bar, two miles east of town. En route to the bar, Creamer drank from a 12-oz. bottle of beer, but did not finish it. At the Silver Bullet Bar, he consumed five additional 12-ounce beers in about 3½ hours.

At approximately 1:00 a.m., January 29, Creamer and Stoddard left the Silver Bullet

Bar to return to Willcox. Stoddard drove. A police car driven by Officer Huey Lee Morris and carrying Sgt. Michael S. Raffety, police officers for the City of Willcox and defendants in this lawsuit, was heading out of town and encountered the Stoddard vehicle. The patrol car turned around and pulled the Stoddard vehicle over for crossing the center line. Morris approached the driver, Stoddard, determined that he was a DWI suspect, and had him step out of the automobile and go with Morris towards the patrol car, which was parked behind. Stoddard was given various field sobriety tests and was placed under arrest for driving while intoxicated.

After Stoddard's arrest, Sgt. Raffety approached the passenger side of the Stoddard vehicle where Creamer was seated and asked him to step out. Creamer did so without any objection and was directed by Raffety to stand at a certain point approximately six feet from the Stoddard vehicle, facing the passenger side door. The police officers had decided that the Stoddard vehicle would be impounded, inventory searched and towed. The police officers testified that this course was decided upon because Stoddard wanted his automobile, which was new, to be secured. Appellant takes issue with this version of the facts and argues that the evidence would support a finding that this decision was made without inquiring of Stoddard whether he would allow Creamer to drive his vehicle home or whether he wished other arrangements made for handling the vehicle. The evidence that counsel for appellant refers to is equivocal and weak, and indicates that Stoddard did not remember such a discussion with the officers, but concludes "there was no discussion." We therefore accept that statement as true.

Sgt. Raffety undertook to conduct an inventory search and entered the Stoddard vehicle from the passenger side door. Creamer, feeling that the search was inappropriate because he believed it went beyond a search incident to arrest according to information he had obtained in a course he had taken at a community college, voiced his objection to the search and moved forward two steps without "particular purpose." Sgt. Raffety stepped out of the Stoddard vehicle and escorted Creamer back to his original position.

Sgt. Raffety continued with the search and again Creamer voiced his objections based upon the lack of consent by Stoddard to the search and again took two steps forward. He was again escorted by Sgt. Raffety back to his original position and warned, "If you do it one more time, you are going to be arrested." At this point, Officer Morris, the other officer on the scene, was standing next to Creamer.

Sgt. Raffety again proceeded with the search, this time from the driver's side door. Creamer again objected and took two steps forward. Sgt. Raffety testified that on one of these occasions, Creamer touched or grabbed him. Creamer denies this, and we accept his denial as true for our purposes. Testimony given by Creamer on cross-examination describes the scene:

"Q. Okay. Now, at the time that you were coming up to Mr. Raffety, Sergeant Raffety, and telling him that he can't search the car, it was your intention to prevent him from doing that, was it not?

A. It was to prevent him from searching what I thought he was searching for, yes, sir.

Q. So it was your intention to prevent him from doing that when you took those two steps forward and told him not to do it?

A. To stop the search?

Q. Yes.

A. Yes, for what I thought the search was for, yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. And at that time it was your intent to stop him from whatever he was doing in the vehicle?

A. That is true."

On the third occasion of Creamer's attempt to prevent the search, Sgt. Raffety instructed Officer Morris to place him under arrest. He was thereupon handcuffed by

Morris and placed in the rear seat of the patrol car. The arrest was for violation of City of Willcox Ordinance No. 9.40.060, obstructing a police officer, a misdemeanor. No pat-down search incident to arrest was ever performed.

Creamer was handcuffed with his hands at his back. When he was placed in the back of the patrol car, the pressure on the handcuffs by leaning back on the seat with his hands caused the handcuffs to tighten, since they were not "double-locked." Creamer asked if the handcuffs could be loosened a bit. His request was directed specifically to Sgt. Raffety, who ignored it. Creamer then directed an obscenity toward Sgt. Raffety. The handcuffs were not loosened until they were eventually removed at the police station. This resulted in the tightened handcuffs causing severe red marks and bruises upon Creamer's wrists.

At the police station, while Creamer was still handcuffed with his hands at his back, Sgt. Raffety told him that he could make a telephone call, taking him into his office and by-passing the booking room, into which John Stoddard was taken. Creamer recited the number of his home phone, and Sgt. Raffety dialed the number and held the telephone receiver to Creamer's ear. Creamer's mother answered the telephone and Creamer told her to bring his younger brother, Tom, to the phone. After the passage of two to three minutes, Creamer's brother Tom was awakened and came to the telephone; however, the line was dead. Sgt. Raffety had taken the telephone receiver from Creamer's ear at a point about 15 to 30 seconds after Creamer had stopped conversing with his mother and listened for himself to hear that no one was on the other end. He hung up the phone and told Creamer, "You are staying the night."

Creamer's mother and brother became concerned and proceeded to drive around Willcox looking for him. They eventually stopped Stoddard, who had just been released into the custody of his employer, at the police station. Creamer's mother was given the impression that she could not get her son out of jail at that time, and she and Tom returned home.

The policy of the City of Willcox police station dictated that all in-coming prisoners to be placed in cells must be subjected to a strip search and visual body cavity inspection. The reason for the policy was that the jail facility was small, although plaintiff's exhibits 23 and 26 together indicate at least four cells. Thus, for security reasons, according to the police chief, all prisoners were subjected to this strip search. Creamer testified that the search was conducted on a cold cement floor and that the search caused him humiliation and anguish. After the strip search in a locker room, Creamer was escorted to a jail cell where he was incarcerated alone, apparently the only arrestee incarcerated at the time, since Mr. Stoddard had been released, with other jail cells available in the event of other arrestees.

The Willcox police station had been furnished a bail bond schedule for the posting of bail at the time of booking for certain offenses, e.g., traffic offenses and certain felonies. The schedule did not specify bail bond amounts for violations of the city ordinances, civil or criminal, although the police chief had discussed the problems presented by an incomplete bond schedule with the local justice of the peace on several occasions prior to 1980. Since the violation in question was for a city ordinance, no such bail schedule was available which pertained to Creamer, nor did anyone ever inform Mr. Creamer of any possibility of bail or release. Thus, he was unable to post bail, and because Sgt. Raffety hung up the phone, he was unsuccessful in arranging for third-party release in lieu of being confined in jail. At the point of incarceration, he was subjected to the strip search procedure.

When Creamer's mother returned home, she awakened his father who called the police station and unsuccessfully attempted to arrange for his release on bail or otherwise that night. He learned from Sgt. Raffety that there would be no release because Creamer was belligerent, although

Sgt. Raffety testified that he had discretion under the law to incarcerate Bill Creamer or release him to a third party. A second phone call to Officer Raffety produced the same result. Mr. Creamer then called the chief of police at his home but was told it was Chief Morales' policy not to override an arresting officer's decision. A third phone call to Officer Raffety resulted in an agreement to release Bill. The elder Mr. Creamer came to the police station, spoke to Sgt. Raffety, and at approximately 7:00 that morning arranged for Bill's release into his custody without any initial appearance being had and without the posting of any bail money. Otherwise, an initial appearance before the local magistrate would not have been held until 2:00 p.m. that afternoon. At the time of release, a form was handed to Creamer and his signature requested. Sgt. Raffety stated to Creamer's father, "I don't like your son's attitude." He warned Creamer that "Your 24 hours aren't up yet." Rule 4.1(c), Rules of Criminal Procedure, 17 A.R.S., provides that an arrested person "shall be taken before a magistrate without unnecessary delay," and that the arrested person shall be released immediately if not brought before a magistrate within 24 hours after his arrest. Creamer was thereupon released into his father's custody.

On April 2, 1980, he was convicted in the City of Willcox magistrate court for violating City of Willcox Ordinance No. 9.40.060, and was sentenced to pay a fine of $112. On May 22, 1980, he was acquitted on appeal in a trial de novo in the superior court.

The two primary questions presented for our consideration on appeal are whether the defendants were entitled to judgment as a matter of law in the malicious prosecution claim for which summary judgment was entered against the plaintiff, and whether the motion for directed verdict on the remaining counts by the defendants should have been granted. A number of subissues which we shall discuss in due course are also raised. Additional facts beyond the previous factual recitation will be discussed where necessary in considering the individual issues.

## SUMMARY JUDGMENT ON MALICIOUS PROSECUTION CLAIM

■ Summary judgment was entered for the defendants on the malicious prosecution claim on the basis of *Wisniski v. Ong*, 94 Ariz. 123, 382 P.2d 233 (1963). There the supreme court held that where a person is convicted in the magistrate court, although that conviction is reversed by appeal, and even when the appeal is a trial de novo, probable cause is conclusively established as a matter of law. Where probable cause is established, a claim for malicious prosecution is properly disposed of on summary judgment. In accord is the Restatement (Second) of Torts, § 667 (1977), which states:

"The conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless a conviction was obtained by fraud, perjury or other corrupt means." Id. at 437.

Appellant's sole argument is that, because the magistrate was an employee of the City of Willcox, there was some sort of fraud, perjury or corruption by the inherent conflict of interest of the magistrate. We refuse to give credence ipso facto to this contention, without some substantiation. Appellant appears to ask us to take judicial notice that the alleged conflict of interest is tantamount to fraud. We decline the invitation. It thus appears that the probable cause question is governed by *Wisniski*, and the summary judgment on the malicious prosecution charge (Count II of the original complaint) is therefore affirmed.

## JUDGMENTS ON DIRECTED VERDICT

■ As indicated at the outset of this decision, when a motion for directed verdict under Rule 50 of the Rules of Civil Procedure, 16 A.R.S., is presented, the court is to consider all facts and conclusions or inferences that may be derived from those facts

in the light most favorable to the party opposing the motion for directed verdict. Considering the evidence from that viewpoint, the question becomes whether reasonable men could differ and return a verdict in favor of the party opposing the motion for directed verdict. When reasonable persons could not differ as to the conclusions to be drawn from such facts and inferences, a directed verdict is appropriate. *Rocky Mountain Fire and Casualty Company v. Biddulph Oldsmobile,* 131 Ariz. 289, 640 P.2d 851 (1982). We have attempted to set forth the facts in that light, drawing heavily from the recitation of facts contained in plaintiff's opening brief.

### A. The probable cause to arrest claims.

Plaintiff first argues that the directed verdict against him was improperly rendered for the false arrest/false imprisonment and ancillary civil rights claims involving lack of probable cause to arrest. Defendants had also moved for summary judgment on the false arrest/false imprisonment claims.

 False arrest or false imprisonment is the detention of a person without his consent and without lawful authority. *Slade v. City of Phoenix,* 112 Ariz. 298, 299, 541 P.2d 550 (1975). Where detention is pursuant to legal authority, the essential element of unlawful detention, is lacking. Id. The sole ground urged by the plaintiff as the basis for his contention that he was unlawfully detained is that his initial arrest was without probable cause. As discussed above, our supreme court has held in the context of a malicious prosecution action that probable cause is established as a matter of law by virtue of the plaintiff's conviction in city court, notwithstanding his subsequent acquittal in a trial de novo in superior court. *Wisniski v. Ong,* supra. Although the trial court granted summary judgment on the malicious prosecution claim on the basis of *Wisniski,* it refused to apply that holding to the false arrest and false imprisonment claims, and instead made its own determination that probable cause existed as a matter of law after hearing all the evidence. In light of the fact that lack of probable cause is the sole basis for plaintiff's false arrest and false imprisonment claims in this case, however, we see no reason why the holding in *Wisniski* should not be dispositive of these claims. The existence of probable cause having been established as a matter of law, the trial court should have granted defendants' motion for summary judgment on these claims. The directed verdict is affirmed.

 With regard to the ancillary § 1983 claim [1] (Count II), plaintiff argues that collateral estoppel should not apply to preclude re-examination of the probable cause issue. In addressing this question, we are guided by the United States Supreme Court's decision in *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). McCurry, prior to his criminal trial, had filed a motion on Fourth and Fourteenth Amendment grounds seeking to suppress evidence seized by police. The motion was denied, McCurry was subsequently convicted, and his conviction was affirmed on appeal. Because there was no assertion that he had been denied a "full

---

1. The 42 U.S.C. § 1983 cause of action is a constitutional tort which "provides that every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Section 1983 is derived from the Act of April 20, 1871." C. Antieau, Federal Civil Rights Acts: Civil Practice at 48–49 (1971).

As such the cause of action must demonstrate in its prima facie case (1) that the city and the named employees were acting under color of law; (2) that the deprivation complained of was a right or interest secured by the federal constitution or laws; (3) that the deprivation complained of was intentional or the reasonably foreseeable result of a voluntary act or omission and (4) that the injury alleged was proximately caused by the defendant(s). J. Cook and J. Sobieski, Jr., Civil Rights Actions (1984). See *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

and fair opportunity" to litigate the constitutional claims in state court, McCurry was barred from seeking federal habeas corpus relief. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The same claims were subsequently raised, however, in a suit against the police officers for damages under 42 U.S.C. § 1983. The Supreme Court granted certiorari to determine whether "the unavailability of federal habeas corpus prevented the police officers from raising the state courts' partial rejection of McCurry's constitutional claim as a collateral estoppel defense to the § 1983 suit against them for damages." 101 S.Ct. at 413.

The court noted that as a general rule the federal courts will give preclusive effect to issues decided by state courts and, indeed, are required to do so under 28 U.S.C. § 1738 whenever the state court from which the judgment emerged would do so. The court then considered whether Congress intended, in enacting § 1983, to repeal or restrict traditional doctrines of preclusion as they would otherwise pertain to actions brought under that statute. The court found that, in enacting § 1983:

"... Congress had intended a federal remedy in three circumstances: where state substantive law was facially unconstitutional, where state procedural law was inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice. [citation omitted] In short, the federal courts could step in where the state courts were unable or unwilling to protect federal rights. [citation omitted] This understanding of § 1983 might well support an exception to res judicata and collateral estoppel where state law did not provide fair procedures for the litigation of constitutional claims, or where a state court failed to even acknowledge the existence of the constitutional principle on which a litigant based his claim. Such an exception, however, would be essentially the same as the important general limit on rules of preclusion that already exists: Collateral estoppel does not apply where

the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court. [citation omitted] But the Court's view of § 1983 in [*Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) ] lends no strength to any argument that Congress intended to allow relitigation of federal issues decided after a full and fair hearing in a state court simply because the state court's decision may have been erroneous." 101 S.Ct. at 419.

Further rejecting the contention that "every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court," the Court held that the court of appeals erred in holding that the inability to obtain habeas corpus relief rendered the doctrine of collateral estoppel inapplicable to McCurry's § 1983 suit. 101 S.Ct. at 420.

 The significance of *Allen v. McCurry* to the instant case is the court's conclusion that a suit which is filed under § 1983 is subject to the defense of collateral estoppel to preclude the plaintiff from relitigating federal claims which he had a "full and fair opportunity" to litigate in previous state court proceedings. Although the Court has subsequently suggested that "additional exceptions to collateral estoppel may be warranted in § 1983 actions" where it appears that the state court was unable or unwilling to protect federal rights, see *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595, 604 (1983), we do not believe that the circumstances of the instant case warrant the invocation of any exceptions to the doctrine, and that therefore plaintiff's § 1983 claim in Count Two is barred as a result of the previous criminal proceedings. The plaintiff had a full and fair opportunity to litigate the issue of probable cause not once, but twice, in the magistrate's court and in the trial de novo in superior court. Contrary to the situation in *Haring v. Prosise,* supra, there is clear Arizona law according res judicata and collateral estoppel effect to those determinations with respect

to the issue of probable cause. Accordingly, we hold that the trial court properly directed a verdict against the plaintiff as to Count II of the amended complaint.

## B. The right to bail claims.

■ As to Count III, plaintiff's claim for damages arising out of the defendants' alleged failure to inform him of the conditions for release, we uphold the directed verdict. At the hearing on defendants' motion, plaintiff failed to comply with the trial court's repeated requests that he supply the court with some authority in support of such a cause of action, nor has he cited any legal authority to this court. We therefore hold that plaintiff has waived any claim of error as to the directed verdict on Count III. Cf. *Spillios v. Green*, 137 Ariz. 443, 671 P.2d 421 (App.1983).

■ However, the directed verdict on Count IV, deprivation of plaintiff's constitutional right to be free on bail under 42 U.S.C. § 1983, must be set aside. The right to bail, inclusive of a right to be informed of the conditions of release, is argued by appellant on both due process and equal protection grounds. It is clear from the facts, viewed in a manner most favorable to the plaintiff, that a jury question exists as to whether the actions of the defendants deprived Mr. Creamer of bail-related interests subject to due process and equal protection.

■ Although the Eighth Amendment to the United States Constitution does not create an absolute right to release on bail in all cases, see *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), considerations of due process and equal protection mandate that classifications of bailable offenses under state law bear a rational relationship to legitimate state interests and that procedures for release on bail or otherwise be administered in a nondiscriminatory manner. We find the Eighth Circuit's analysis of this issue in *Mastrian v. Hedman*, 326 F.2d 708 (8th Cir.1964) to be instructive:

"Neither the Eighth Amendment nor the Fourteenth Amendment requires that everyone charged with a state offense must be given his liberty on bail pending trial. While it is inherent in our American concept of liberty that a right to bail shall generally exist, this has never been held to mean that a state must make every criminal offense subject to such a right or that the right provided as to offenses made subject to bail must be so administered that every accused will always be able to secure his liberty pending trial. Traditionally and acceptedly, there are offenses of a nature as to which a state properly may refuse to make provision for a right to bail. (We are not here concerned with what these offenses may be.) As to the offenses, however, for which a state has provided a right of bail it may not, any more than as to other substantive or procedural benefits under its criminal law system, engage in such administration as arbitrarily or discriminatorily to effect denial or deprivation of the right to a particular accused." 326 F.2d at 710.

It is uncontroverted that the City of Willcox bail schedule contained bail amounts for traffic offenses in compliance with A.R.S. § 22–424 as well as selected non-traffic offenses. No bail amounts were included for violations of city ordinances, although the chief of police testified that this discrepancy in bail scheduling was of concern to him. The intentional processing of misdemeanants by classification into two groups—those for whom a bail amount exists and those for whom it does not—raises a classic equal protection issue under the Fourteenth Amendment. There was sufficient testimony at trial for a reasonable jury to conclude that the classification of appellant as an individual not entitled to release because the ordinance under which he was charged had no specific bail amount or estimate attached to it serves no legitimate state purpose and is per se irrational. See *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), for a recent restatement of basic equal protection principles.

Additionally, there was evidence from which a jury could reasonably infer that Sgt. Raffety infringed appellant's right to release when he arguably arbitrarily interrupted appellant's attempt to secure that release by telephoning his brother. This refusal to release appellant to a third party or on his own recognizance, once the police had affirmatively acted to initiate the release procedure, was conceivably a due process or equal protection infringement of appellant's liberty interest or right to bail and/or release. A jury could also reasonably infer that Officer Morris infringed Mr. Creamer's equal protection or due process right when he arguably arbitrarily refused appellant's direct request for another telephone call since "my last one I did not get." Officer Morris had permitted Mr. Creamer's co-arrestee, Mr. Stoddard, a phone call which resulted in Mr. Stoddard's release without incarceration.

■■■ In addition, the City of Willcox, as the employer of the magistrate who drew up the incomplete list and as the employer of the police chief who continued to administer it without, arguably, sufficient reasonable attempts to remedy the discriminatory effect of its arbitrary classification of misdemeanants into "bailables" and "non-bailables," could reasonably be held liable for tort damages under 42 U.S.C. § 1983. While the City of Willcox cannot be held liable merely as the employer of tortious city policy-makers on a vicarious liability theory, see *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), there is no bar to the liability of the city in its own right under *Monell* based on the directives of the city policy-makers. In *Monell*, supra, the City of New York was found liable in a § 1983 cause of action on the basis of written policies of a municipal department and school board. In the instant case we are dealing with the liability of a municipality considerably smaller than the City of New York for written policies promulgated by the city magistrate and chief of police. In

addition, because a "system of reportation" existed between the city council and the police department, the arguably discriminatory and arbitrary effect of these policies can be reasonably and foreseeably attributed to the city council. Thus, the City of Willcox is reachable because the "execution of a government's policy or custom ... made ... by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible [for] under § 1983." 98 S.Ct. at 2037. Thus, the equal protection claim may be pursued against the City of Willcox, while the due process and equal protection claims are appropriate for jury consideration against defendants Raffety and Morris.

### C. Unreasonable delay in presentment to magistrate claim.

■■■ The statute authorizing bail schedules requires admission to bail "... at any time after arrest and before conviction...." A.R.S. § 22–424. It does not provide for immediate bail. The procedure upon arrest is prescribed in Rule 4.1, Rules of Criminal Procedure, 17 A.R.S. Creamer was released well within the 24-hour initial appearance time limit. There is no requirement that the person arrested be taken immediately before a magistrate, nor for the magistrate to be available 24 hours a day for the initial appearance. *State v. Mahoney*, 25 Ariz.App. 217, 542 P.2d 410 (1975). Overnight confinement pending arraignment before a magistrate has been held not to constitute a deprivation of due process rights nor to constitute a violation of the arrestee's civil rights under 42 U.S.C. § 1983. *Patzig v. O'Neil*, 577 F.2d 841 (3rd Cir.1978); *Daly v. Pedersen*, 278 F.Supp. 88 (D.Minn.1967); *Sopp v. Gehrlein*, 232 F.Supp. 881 (W.D.Pa.1964). See also, Annot., 98 A.L.R.2d 966 (1964). We find that the verdict was properly directed on both the state and federal claims of unreasonable delay in presentment to a magistrate. (Counts V and VI).[2]

**2.** This finding is not contradictory to our deci-

sion in the right to bail claim since state law

**D. Intentional infliction of emotional distress, invasion of privacy, and cruel and unusual punishment claims.**

While we uphold the directed verdict on the intentional infliction of emotional distress claim, because no evidence was presented which would meet the state law requirement for "extreme and outrageous ... conduct," *Continental Life & Accident Company v. Songer*, 124 Ariz. 294, 603 P.2d 921 (App.1979), we set aside the directed verdict in favor of appellees Raffety and Morris on the § 1983 cruel and unusual punishment claim. Pretrial detainees are not to be recipients of conduct which is in effect punishment. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Putnam v. Gerloff*, 639 F.2d 415 (8th Cir.1981); The statement by Sgt. Raffety that he did not like Creamer's "attitude," that a "culmination of his attitude, all of it together, is why I arrested him ...," his abrupt interruption of Creamer's telephone call, his failure to bring up the subject of bail, (although he admitted that whether to release Creamer was within his discretion), all with full knowledge that the arrestee, if incarcerated, would be subjected to a strip search and anal cavity inspection, are pivotal evidence for a jury to evaluate as to whether the conduct of the police towards Creamer amounted to cruel and unusual punishment in the pretrial context under the federal constitution and thus compensable in damages. Officer Morris acquiesced in this conduct. The directed verdict in favor of defendants Raffety and Morris must be reversed on Count VIII.

The directed verdict on the invasion of privacy claim is upheld. Arizona law requires the same standard for an invasion of privacy claim as for intentional infliction of emotional distress. Since we believe the trial court ruled properly on the latter claim, we find it also acted properly

on the former claim (Count IX). *Valencia v. Duval Corp.*, 132 Ariz. 348, 645 P.2d 1262 (App.1982).

**E. Right to privacy claims under 42 U.S.C. § 1983.**

The right to bodily privacy is constitutionally protected, and violations of that right may be redressed in a § 1983 cause of action. *Scott v. Plante*, 532 F.2d 939 (3rd Cir.1976); *Runnels v. Rosendale*, 499 F.2d 733 (9th Cir.1974). In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court held that visual body cavity inspections established under a correctional center's rules could be conducted without having probable cause to believe that the specific pretrial detainee being searched had weapons or other contraband on his person. However, the court stated that strip-search policies must be evaluated according to a test of reasonableness:

"In each case it requires a *balancing* of the *need* for the particular search against the *invasion* of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 99 S.Ct. at 1884. [Emphasis added]

In the instant case, we have uncontroverted evidence that the arrestee was the only one to be incarcerated that night, with more than half the night gone. There is additional evidence of at least four cells in the Willcox Jail, each apparently completely enclosed. No common holding tank is described in this facility. The arrestee had allegedly committed a non-violent misdemeanor according to police, with some question whether any offense was ever committed by Mr. Creamer.

defines "unreasonable delay" as greater than 24 hours, a timeframe which is not irrational on its face for federal constitutional purposes. The arguably arbitrary and capricious conduct on the part of defendants is much more directly

related to a due process or equal protection infringement of a right to bail or liberty interest than any delay clearly reasonable as defined by statute.

■ Under *Bell v. Wolfish,* supra, the reasonableness of a governmental strip search policy must be determined on a case-by-case basis. Four factors aid in the determination of reasonableness: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it and (4) the place where it is conducted. *Bell v. Wolfish,* supra, 99 S.Ct. at 1884. There is no question that the scope of the intrusion is great. Both the majority of five and the dissent of four justices agree on this point in *Bell.* The intrusion is just as great in Willcox as in New York City, the locus of *Bell v. Wolfish.* However, neither the manner in which the search was conducted nor the place appears more offensive in the instant case than in *Bell.* It is the justification for the search in this case, as well as the justification generally for the blanket policy, that must be balanced against the massive intrusion. Mr. Creamer was not a sentenced prisoner as were some of the inmates in *Bell.* He was not a pre-trial detainee who could not make bail, as were most of the inmates in *Bell.* His search was not initiated after detainee contact visits with non-prisoners as in *Bell.* He was not introduced into the general jail population, since there was none, as in other cases where strip search/body cavity searches have been upheld. See *Dufrin v. Spreen,* 712 F.2d 1084 (6th Cir.1983); *Roscom v. City of Chicago,* 570 F.Supp. 1259 (N.D.Ill. 1983); *Giles v. Ackerman,* 559 F.Supp. 226 (D.Idaho 1983). Nor was he arrested for a felony, as in *Dufrin v. Spreen,* supra.

The instant case more nearly parallels *Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), cert. den., 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982), sub nom. *Clements v. Logan,* where, in a 42 U.S.C. § 1983 suit, the dismissal of claims related to a strip search was reversed and the case remanded for further proceedings against certain defendants. In *Logan,* as in the instant case, the arrestee was placed in a single "holding cell" prior to release and was never intermingled with the general jail population. In addition, Logan, an attorney who was acquainted with the local law enforcement scheme, was afforded a magistrate's hearing *prior* to the strip search and was to be released on her own recognizance, apparently after "sobering up." No such hearing was afforded Mr. Creamer. The Court in *Logan* was persuaded also, with respect to the strip search claim, that there was no cause to believe that one arrested on a DWI charge would be in possession of contraband or weapons. This reasoning applies even more strongly to the instant case where Mr. Creamer's offense was seemingly more one of verbal assertiveness than physical aggression.

■ Similarly, we believe, as the Fourth Circuit did in *Logan,* that evidence relating to a good faith defense is "one of fact for the jury under appropriate instructions as to the burden of proof and the substantive elements of the defense." 660 F.2d at 1014. Thus on Count X we reverse for trial against all defendants. Upon remand, Mr. Creamer is entitled to a jury determination of the facts relating to the strip search against the four-part reasonableness standard of *Bell v. Wolfish,* supra. In addition, the defendants Raffety and Morris must plead and establish before the jury a good faith immunity defense, should the jury find the strip search policy unreasonable as it was applied to Mr. Creamer. No punitive damages are available on any of the damage claims against the City of Willcox, however, under *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

■ While a strip search is clearly justified in many instances, we believe a blanket policy that would subject anyone incarcerated on any offense to a strip and body cavity search to be impermissibly broad. According to the testimony of the police chief, an individual arrested on a misdemeanor charge associated with a barking or unlicensed dog could be subjected to this indignity. A scope this wide is clearly insupportable. The interaction of the blanket strip search policy with an incomplete bail

list creates a Kafkaesque [3] scheme whereby Mr. Creamer or any other misdemeanant could suffer a massive intrusion upon the right to privacy in the future at the hands of law enforcement personnel stretching the limits of their discretion to release and acting on little or no justification.

As to Count XI, we find as a matter of law, based on the facts as applied against the *Bell v. Wolfish*, standard, that the blanket policy of the City of Willcox [4] is an unreasonably burdensome intrusion upon the arrestee's right to privacy secured by the Federal Constitution. *Runnels v. Rosendale*, supra.

We remand to the trial court for an order to be fashioned by that court consistent with this declaration of the blanket strip search policy as unconstitutional under federal law. The order shall require the City of Willcox to tailor its strip search/body cavity search policy to the security needs of the Willcox facility. For example, a strip/cavity search may be required after any jail visits, as in *Bell v. Wolfish*, supra. Such searches would also be sanctioned when individuals will be housed together in the same cell unsupervised by jail personnel.

The judgment of the trial court is reversed as to Counts IV, VIII, X and XI of the amended complaint, and the matter is remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.

BIRDSALL and HOWARD, JJ., concur.

---

3. In *The Trial,* Franz Kafka described the archetypal encounter of the ordinary mortal with the capriciousness and irrationality of modern bureaucracies.

4. The execution of a government's policy or custom by makers of official policy such as the chief of police is sufficient for attributing liability to a municipality. *Monell,* supra, 98 S.Ct. at 2036. In this case, the chief of police drew up and ordered the strip search policy. In addition, the reporting system outlined by the city manager, discussed above, is a sufficient basis for attributing the blanket policy ordained by the chief of police to the City of Willcox.

"Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision *officially adopted and promulgated by that body's officers.* Moreover, although the touchstone of the § 1983 action against a governmental body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental custom *even though such a custom has not received formal approval through the body's official decisionmaking channels.* As Mr. Justice Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970): 'Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Monell,* supra, 98 S.Ct. at 2035. (Emphasis added)