722 P.2d 250

**Edward A. WAGNER and Andrea Wagner, husband and wife, Appellants,**

v.

**CITY OF GLOBE, a municipal corporation, Appellee.**

No. 18564–PR.

Supreme Court of Arizona, En Banc.

June 24, 1986.

Mesch, Clark & Rothschild, P.C. by Tom R. Clark, Tucson, for appellants.

William L. Tifft, Globe, for appellee.

GORDON, Vice Chief Justice.

We granted this Petition for Review to determine whether summary judgment was properly entered against the petitioner in light of allegations that his at-will employment was terminated in breach of implied contract and in violation of public policy.

The court of appeals affirmed the entry of summary judgment by memorandum decision. *Wagner et ux v. City of Globe*, 2 CA–CIV 5361 (filed Oct. 11, 1985). We have jurisdiction pursuant to Ariz. Const. art. 6 § 5(3) and Rule 23, Ariz.R.Civ. App.P., 17A A.R.S.

As a preliminary matter, we note that summary judgment is improper if, upon examination of the entire record, it may be determined that there is a disputed fact which, if true, could affect the final judgment. *Livingston v. Citizens Utility, Inc.*, 107 Ariz. 62, 481 P.2d 855 (1971). Summary judgment is not proper where there is the slightest doubt as to the facts, *Peterson v. Valley Nat'l Bank of Phoenix*, 90 Ariz. 361, 368 P.2d 317 (1962), and even where the facts are undisputed, summary judgment is not proper if the evidence is of such a character that reasonable minds could draw different conclusions or inferences therefrom. *Livingston v. Citizens Utility, Inc., supra; Creamer v. Raffety*, 145 Ariz. 34, 699 P.2d 908 (App.1984). Moreover, when reviewing on appeal the propriety of summary judgment we will consider the record in the light most favorable to the losing party. *Livingston v. Citizens Utility, Inc., supra; Creamer v.*

*Raffety, supra.* With these precepts in mind, we turn to the facts.

Edward Wagner was hired as a police officer for the City of Globe on May 20, 1974. The minutes of the Globe City Council indicate that he was hired by the city council after recommendation from the police department. It is undisputed that Wagner was placed on a six-month probationary status.

Approximately two months after Wagner was hired his attention was drawn to the strange case of Mr. Hicks. Hicks had been sitting on a bus stop bench, and when approached by two police officers refused to produce any identification. He was then arrested for vagrancy pursuant to a city code section which had been amended or abolished over a year earlier. Eventually Hicks was given a ten-day jail term. Several days later Hicks approached Wagner and asked him when he would be arraigned. Wagner then determined that Hicks had been in jail for 21 days, despite his original sentence of ten days, and had not yet been arraigned. Wagner further determined that Hicks was being held under a statute amended more than a year earlier. Wagner arranged to take Hicks before the local magistrate, where he was sentenced to ninety days. Wagner then pointed out to the judge that the arrest was illegal and that Hicks had been detained eleven days beyond his original sentence. Although the judge then suspended the sentence, he became upset and indicated that he was going to talk to Wagner's chief. Later that day, the Chief of Police, Dale Van Buskirk, told Wagner he did not appreciate "big city cops" coming to Globe to tell him how to run his department. Fearing that he might be terminated, Wagner photocopied police documents which he believed would show he had done nothing wrong. In his affidavit Van Buskirk stated that

Wagner was fired because "it became apparent to me that the continued employment of Patrolman Wagner ... was not in the best interest of the City...."

On August 2, 1974, Wagner received a written notice of termination from Van Buskirk effective immediately. On August 5, 1974, Wagner addressed a meeting of the city council to protest his termination. No official action was taken by the council at that time. On May 15, 1975, Wagner filed suit against the City of Globe, the city council members, and Van Buskirk, alleging wrongful discharge, slander, and racial discrimination.[1] On July 7, 1975, the city council met and approved the firing of Wagner. The trial court granted the defendant's summary judgment on all three counts on December 12, 1980. Wagner has appealed only on Count I, his allegation of wrongful discharge.

■ Every employment contract for an indefinite term is presumed to be terminable at will. *See* Note, *Protecting At-Will Employees Against Wrongful Discharge: The Duty to Terminate Only In Good Faith,* 93 Harv.L.Rev. 1816 (1980). All parties have agreed that Wagner was an "at-will" employee; that is, his employment was for an indefinite term, at sufferance, and the employment could be terminated by either party, at will, for no cause or any cause. *See* Mauk, *Wrongful Discharge: The Erosion of 100 Years of Employer Privilege,* 21 Idaho L.Rev. 201 (1985). This principle, generally referred to as the employment-at-will doctrine, is uniquely a product of the American common law. The at-will rule has been traced to an 1877 treatise by Horace G. Wood entitled *Law of Master and Servant.* H.G. Wood, *Master and Servant* (1877). No doubt the title of the treatise says all that need be said regarding Woods' view of employment relations.[2] The doctrine of employment-at-will

1. Wagner is Mexican-American.

2. Ironically, workers were afforded greater protection by the reciprocal master-servant relationship than by the evolving "contractarian" philosophy of employer-employee relationships. "The principal consequence of this conceptual change was a drastic limitation in the employer's duties to her employee. While previously the master bore a customary responsibility for the servant's health and well-being, the new theory supposed that by entering into the wage bargain workers assumed the risk of on-the-job injuries." Note, *Protecting At-Will Employees*

found fertile ground in the laissez-faire climate of nineteenth century America and thrived until very recently. Increasingly, however, the doctrine is under attack. *See, e.g.,* Mauk, 21 Idaho L.Rev. 201, *supra;* Mallor, *Punitive Damages for Wrongful Discharge of At Will Employees,* 26 Wm. and Mary L.Rev. 449 (1985); Note, 93 Harv.L.Rev. 1816, *supra.* Today three-fifths of the states have recognized some form of a cause of action for "wrongful discharge". 26 Wm. and Mary L.Rev. at 452. The trend has been to modify the at-will doctrine by creating exceptions to its operation.[3] Three major exceptions have been developed: the "implied contract" exception, which relies upon proof of an implied promise of continued employment absent just cause for termination to protect the legitimate expectations of workers, and which may be established by oral representations, a course of dealing, personnel manuals or memoranda; the "public policy" exception, which permits recovery upon a finding that the employer's conduct undermined some important public policy; and the implied covenant of "good faith and fair dealing", which protects employees from termination for bad cause. *See Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 376, 710 P.2d 1025, 1031

(1985); *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 545–546 n. 1, 688 P.2d 170, 171–172 n. 1 (1984).[4] Arizona recognizes all three exceptions. *Wagenseller v. Scottsdale Memorial Hospital, supra.* Petitioner Wagner raises two theories of wrongful discharge: breach of contract and violation of public policy.

## BREACH OF CONTRACT

The at-will employment relationship, despite its limitations, is nonetheless contractual. Employment contracts, particularly those which would be considered at-will, are the best and most typical examples of unilateral contracts. *See* Mauk, 21 Idaho L.Rev. at 212–213; Note, *Employee Handbooks and Employment-At-Will Contracts,* 1985 Duke L.J. 196, 212–219. Unlike a bilateral contract, a unilateral contract does not require mutuality of obligation; but there is sufficient consideration in the form of services rendered. This is true despite the fact that the employee may quit at any time. *See* 1A A. Corbin, *Corbin on Contracts* § 152, at pp. 13–14 (1963). Because the at-will employment relationship is contractual, it can be modified by the parties at any time just as other

*Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,* 93 Harv.L.Rev. 1816, 1824–25 (1980) (citations omitted). "Under the new laissez-faire conceptions, the commitments between employer and employee were limited; the traditional notions of mutual responsibility, and the security for the employee they entailed, were abandoned." *Id.* at 1825.

3. Despite the growing trend to create exceptions to the at-will doctrine, which may eventually swallow the rule, employers continue to cling to the doctrine. Exactly why is uncertain since it has been noted that:

"The continuity and expertise supplied by a stable work force, the benefits from loyalty, and the savings from reduced training costs and lower turnover all contribute to the long-run success of an enterprise. Employees' fears of being replaced and the threat of unfair treatment both have a significant negative economic impact because they foster dissatisfaction and disloyalty. Recent studies of worker participation projects reveal that productivity often improves significantly with increased job security and employee participation; a cooperative

employer-employee atmosphere, moreover, tends to reduce absenteeism, the turnover rate, and sabotage. Thus, the abandonment of the at-will rule may improve business productivity in the long run even though it may somewhat curtail the employer's traditional control of the work place". Note, 93 Harv.L.Rev. at 1835 (citations omitted).

4. Modification of the at-will doctrine has not been the exclusive province of the judiciary. Congressional and legislative enactments have significantly limited the application of the doctrine in some areas of labor law. There are at least fifteen federal statutes, plus their promulgated rules, which limit the at-will doctrine. 21 Idaho L.Rev. at 226 n. 109. For example, statutes protect concerted union activity, preserve minimum wage and overtime pay requirements, prohibit discrimination based on age, handicaps, race, sex, or religion, prohibit discharge because of wage garnishment or federal jury service, and protect employees who report health and safety violations. *Id.* at 227. Comparable state statutes have been enacted by many state legislatures. *Id.*

contracts can be modified. Accordingly, the presumption that employment contracts of indefinite duration are terminable at will can be modified by the parties. *Wagenseller v. Scottsdale Memorial Hospital, supra; Leikvold v. Valley View Community Hospital, supra.* The parties may create a different relationship, and define the parameters of that relationship, based upon the totality of their statements and actions regarding the employment relationship. *Wagenseller v. Scottsdale Community Hospital,* 147 Ariz. at 383, 710 P.2d at 1038.

■ One widely accepted means of modifying the at-will contract is use or publication of personnel manuals, guides, or rules by employers. An employer's representations contained in a personnel manual "can become terms of the employment contract and limit an employer's ability to discharge his or her employees. . . .", *Leikvold v. Valley View Community Hospital,* 141 Ariz. at 546, 688 P.2d at 172, even though the personnel policies were not bargained for at the time of hiring.

■ Wagner claims that his discharge was accomplished in violation of the City of Globe's own personnel rules, and therefore in breach of contract. In order to establish a breach of contract claim based upon a violation of personnel rules a plaintiff must prove two things: the personnel manual actually became part of the employment contract and the terms of the manual were breached.

■ Whether the parties intended to modify their at-will contract, by use of a personnel manual or otherwise, is a question of fact. *Leikvold v. Valley View Community Hospital,* 141 Ariz. at 548, 688 P.2d at 174. Evidence relevant to this decision includes the language of the personnel manual, any representations made by the employer, and the course of dealing between the employer and employee. *Id.*[5] Reliance is not an essential predicate to the action, but is only one of the several relevant factors. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 381, 710 P.2d at 1036. Summary judgment is inappropriate where a genuine dispute exists as to material facts, *Leikvold v. Valley View Community Hospital,* 141 Ariz. at 548, 688 P.2d at 174, or where reasonable minds could draw different conclusions or inferences from undisputed facts. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 383, 710 P.2d at 1038. Whether the personnel rules promulgated by the City of Globe for the benefit of its employees became part of Wagner's at-will contract is a factual question inappropriate for summary judgment.

Wagner also contends that the city failed to follow its own rules when he was discharged. Rule XIII of the personnel rules reads in part:

"Rule XIII. PROBATIONARY PERIOD

\* \* \* \* \* \*

SECTION 3. *Rejection of Probationer:* During the probationary period, an employee may be rejected at any time *by the appointing power,* without cause and without the right of appeal. Notification of rejection in writing shall be forwarded to the probationer and a copy

---

**5.** In *Leikvold* we also indicated that employers were free to "issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason." 141 Ariz. at 548, 688 P.2d at 174. However, the absence of a personnel manual or the presence of disclaiming language in its policies may not absolutely insulate an employer from liability.

If contrary written or oral assurances are given to the employee at the hiring interview or during employment, such promises may constitute implied contracts. *See Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981); *see generally* Comment, *Limiting Employment-At-Will in Arizona: Leikvold v. Valley View Community Hospital,* 27 Ariz.L.Rev. 235 (1985) (discussing possible effect of the *Leikvold* decision on employer personnel manuals and representations).

filed with the probationer's file." (emphasis added) [6]

The gravamen of Wagner's complaint is that he was not fired by the "appointing power", as required by the personnel rule. The notification of termination came from Chief of Police Van Buskirk, even though Wagner was hired by the city council. Wagner contends that only the city council had the power to fire him; the city contends that Van Buskirk, as chief of police, had the power to fire him. The city also contends that even if Van Buskirk was not the "appointing power", the city affirmed the discharge and thereby ratified the actions of its agent. The city argues first that its inaction at the August 5, 1974, council meeting in the face of Wagner's vehement protests constitutes an implied affirmance of the discharge. An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it, especially where one would naturally be expected to speak if he did not consent. Restatement (Second) of Agency § 94. While it can be plausibly argued that the failure of the city council to repudiate Van Buskirk's actions justifies an inference of assent, other interpretations are equally reasonable. The Restatement cautions that "[w]hether or not such an inference [of assent] is to be drawn is a question for the jury, unless the case is so clear that reasonable men could come to but one conclusion." *Id.*, comment a.

The city also argues that a principal can retroactively ratify the actions of its agent, and that it did so by voting on July 7, 1975, to affirm Van Buskirk's actions. Whatever the merits of respondents' argument in the ordinary case of *post hoc* ratification, they fail to persuade us here. The city council's belated attempt to affirm the dismissal came nearly two months *after* the petitioner filed suit against the city. Allowing the city to retroactively affirm Van Buskirk's actions after the commencement of the lawsuit would divest the petitioner of a "right or defense" in derogation of his right to bring the cause of action. Restatement (Second) of Agency § 90 comment a; *cf. Hall v. A.N.R. Freight System, Inc.*, 149 Ariz. 130, 717 P.2d 434 (1986) (substantive rights vest upon the filing of a lawsuit and cannot be retroactively impaired).

Thus the question of whether the city's inaction on August 5, 1974, constituted an affirmance of the dismissal is properly a jury question; but as a matter of law the city's July 7, 1975, vote may not operate as a retroactive affirmance. If the jury should decide that the personnel rules did constitute a contract, they must next interpret the rules. If the terms of an agreement are clear and unambiguous, the construction of the contract is a question of law for the court. *Leikvold v. Valley View Community Hospital*, 141 Ariz. at 548, 688 P.2d at 174. However, if the terms of an agreement can reasonably be construed in more than one manner, the language is ambiguous and its construction is a question for the jury. *Id.* Our review of the personnel rules and related extrinsic evidence leaves little doubt that reasonable minds could differ over the proper construction of the rules. Consequently, summary judgment on this issue was also improper. The petitioner's claim for breach of contract is properly a question for the jury.

## PUBLIC POLICY

Employees should not have to choose between their jobs and the demands of important public policy interests; thus

---

6. This contrasts with the provisions for non-probationary employees. Rule XVII provides in part:

"Rule XVII. SEPARATION FROM THE SERVICE

Section 1. *Discharge:* An employee in the classified service may be discharged *for cause* at any time by the City Manager. Any employee who has been discharged shall be furnished with a written statement of the reasons for such actions and shall be entitled to a hearing if he so requests as provided in these rules." (emphasis added) This provision, as well as the detailed appeal provisions which follow it, implicates a limited property interest in continued employment wholly absent for probationary employees sufficient to require due process of law in connection with termination. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709–2710, 33 L.Ed.2d 548 (1972).

courts have developed the public policy exception to the at-will doctrine. Actions for wrongful discharge in breach of public policy are essentially breaches of duties imposed by law, and are best characterized as actions in tort rather than contract. In *Wagenseller v. Scottsdale Memorial Hospital, supra,* this Court adopted the public policy exception, noting that "[f]iring for bad cause ... violates rights guaranteed to the employee by law and is tortious." 147 Ariz. at 381, 710 P.2d at 1036. The tort of wrongful discharge in violation of public policy has been variously labeled: discharge for bad cause, retaliatory discharge, improper discharge, etc. Whatever the nomenclature, our concern remains the same: employees should not be discharged because they performed an act that public policy would encourage, or refused to do that which public policy condemns.

In its initial stage the public policy exception was designed to discourage discharges in violation of a statutory expression of public policy. *See Petermann v. Teamsters Local 396,* 174 Cal.App.2d 184, 344 P.2d 25 (1959) (seminal declaration of the public policy exception; employee discharged for refusal to commit perjury). However, an explicit statutory expression of public policy is no longer required. In *Wagenseller v. Scottsdale Memorial Hospital, supra,* we stated that "reliance on prior judicial decisions, as part of the body of applicable common law, is appropriate ... [and] we will look to the pronouncements of our founders, our legislature, and our courts to discern the public policy of this state." 147 Ariz. at 379, 710 P.2d at 1034. Public policy must truly be public, however, rather than merely private or proprietary. *Id.*

The public policy exception defies easy application because different factual patterns have been collected under the same general rubric of "public policy". Perhaps the easiest and least controversial pattern involves an employee's refusal to participate in illegal behavior. *See Petermann v. Teamsters Local 369, supra; Vermillion v. AAA Pro Moving & Storage,* 146 Ariz. 215, 704 P.2d 1360 (App.1985). Most

courts agree with the *Petermann* principle that an employee should not be faced with the dilemma of violating the law or losing his job. Another category encompasses those cases where an employee is discharged for performing an important public obligation. *See, e.g., Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for accepting jury duty). If the employer were permitted to discharge employees for fulfilling public obligations the will of the community would be thwarted. A third type of case involves the discharge of employees who exercise a legal right or privilege. For example, numerous states have held that the termination of an employee because he had filed a workers compensation claim violates public policy. *See, e.g., Lally v. Copygraphics,* 85 N.J. 668, 428 A.2d 1317 (1981); *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978); *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973). In California the termination of an employee for signing a union membership application violates public policy since the employee has a statutory right to join a labor organization. *Glenn v. Clearman's Golden Cock Inn, Inc.,* 192 Cal.App.2d 793, 13 Cal.Rptr. 769 (1961). The fourth type of public policy exception presents the most difficult analytic problem for courts. These cases involve the employee "whistleblower" who exposes wrongdoing on the part of his employer and is then discharged. *See* Mauk, 21 Idaho L.Rev. at 239–245.

The employee who chooses to report illegal or unsafe conduct by his employer differs significantly from the employee forced to choose between his job and actual participation in illegal behavior. The latter is the paradigmatic case of a public policy violation; in contrast the whistleblower faces the arguably less onerous choice of either ignoring the known or suspected illegality or becoming an instrument of law enforcement. Nonetheless, whistleblowing employees have gained a measure of judicial protection. *See, e.g., Palmateer v. International Harvester Co.,* 85 Ill.2d 124,

52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980); *Harless v. First National Bank of Fairmont*, 246 S.E.2d 270 (W.Va.1978).

The petitioner asserts that he was terminated from the police force because he refused to conceal the illegal arrest and detention of Mr. Hicks and was instrumental in having Hicks brought before a magistrate. The petitioner suggests that had he acquiesced in the illegal detention he could have been personally liable to Hicks under the holding of *Creamer v. Raffety, supra* (plaintiff brought suit against law enforcement officials based on 42 U.S.C. § 1983 and claims of false arrest, false imprisonment, and malicious prosecution). If true, then Wagner's behavior would be protected as a refusal to participate in proscribed activity. *See Petermann v. Teamsters Local 369, supra; Wagenseller v. Scottsdale Memorial Hospital, supra* (nurse discharged allegedly for refusing to "moon" the audience during a skit, an act which might violate A.R.S. § 13–1402).

However, we believe that the petitioner's behavior is best characterized as whistleblowing behavior. Wagner took affirmative steps to investigate and rectify the illegal detention and called it to the attention of the police chief and city magistrate. Wagner was not forced to a Hobson's choice between his job and illegal activity; he chose to take affirmative remedial action. This Court has not previously addressed the liability of employers who terminate employees for whistleblowing activity. Our prior cases—*Leikvold v. Valley View Community Hospital* and *Wagenseller v. Scottsdale Memorial Hospital* —dealt tangentially with this issue but did not answer it.

 We believe that whistleblowing activity which serves a public purpose should be protected. So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged. We recognize that there is a tension between the obvious societal benefits in having employees with access to information expose activities which may be illegal or which may jeopardize health and safety, and accepted concepts of employee loyalty, *see* Mauk, 21 Idaho L.Rev. at 239–245; nevertheless we conclude that on balance actions which enhance the enforcement of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose, will inure to the benefit of the public. Indeed, our legislature has recognized that whistleblowing activity is worthy of protection. In 1985 the legislature enacted A.R.S. § 38–532, which protects state and county employees from retaliation for their whistleblowing activity. While A.R.S. § 38–532 is not applicable to this case, it evinces a legislative expression of public policy fully consonant with our decision.

The relevant inquiry is not limited to whether any particular law or regulation has been violated, although that may be important, but instead emphasizes whether some "important public policy interest embodied in the law" has been furthered by the whistleblowing activity. *Cf. Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 380, 710 P.2d at 1035 (employee may refuse to participate in behavior which violates policy of the law, even though no technical violation of the law might result); A.R.S. § 38–532(A)(2) (prohibiting retaliation against employee who exposes "mismanagement, a gross waste of monies or an abuse of authority", in contrast to "a violation of any law" (A.R.S. § 38–532(A)(1)).

Other states have already extended a measure of judicial protection to whistleblowing employees. In *Palmeteer v. International Harvester Co., supra,* the Illinois Supreme Court held that an employee who was fired for supplying information to local law enforcement authorities regarding another employee and agreeing to assist in the investigation and trial stated a cause of action for retaliatory discharge. In *Sheets v. Teddy's Frozen Foods, Inc., supra,* an employee was fired for his efforts to ensure that his employer's products complied

with the applicable state law relating to labeling and licensing. The Connecticut Supreme Court concluded that Sheets had a valid cause of action since "employees . . . are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers." 179 Conn. at 474, 427 A.2d at 388. Finally, in *Harless v. First Nat'l Bank of Fairmont, supra,* the West Virginia Supreme Court recognized a cause of action for an employee who alleged that his discharge was in retaliation for his attempts to require the bank to comply with the laws of the United States and West Virginia. In all of those cases the employees' actions were in furtherance of some public policy "embodied in the law" and were therefore protected.

If the petitioner's allegations are true, as we must assume they are for purposes of this appeal, then he has stated a valid cause of action for wrongful discharge in violation of public policy. No exhaustive canvass of constitutional or statutory authority is necessary to support the proposition that there is no public policy more important or fundamental than the one favoring the effective protection of the lives, liberty, and property of our people. No one will disagree with the proposition that public policy is furthered when the civil rights of our citizens are protected from abuse; for when the rights of even one citizen may be so cavalierly dispatched none may rest easy. The petitioner's successful attempt to free Hicks from illegal confinement was a refreshing and laudable exercise which should be protected, not punished. The police, who are charged with the responsibility of enforcing our laws, should be encouraged to zealously guard the civil rights of our people and not be deterred from rectifying or reporting the abuse of those rights for fear of discharge.

Consequently, the trial court should not have granted summary judgment against the petitioner on his public policy claim. The petitioner has pled facts which, if proven, establish a claim for damages for wrongful termination in violation of public policy. The court of appeals should not have upheld the summary judgment. The appeals court opined that an employee must be compelled to perform an illegal act before he may claim the protection of public policy, but as this decision makes clear this position misreads prior case law and ignores the legitimate demands of public policy. As we have endeavored to show, all employees who attempt to correct problems of public interest fall within the ambit of the public policy exception to the at-will doctrine. Accordingly, the trial court is reversed and the court of appeals' opinion vacated. We remand to the trial court for further proceedings not inconsistent with this opinion.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.