**Yves DAMBREVILLE, Plaintiff,**

v.

**CITY OF BOSTON, Defendant.**

**Civil Action No. 94–12401–MLW.**

United States District Court,
D. Massachusetts.

Nov. 21, 1996.

David B. Rome, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, MA, for Plaintiff.

Robert Boyle, City of Boston Law Department, City Hall, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON MOTION OF DEFENDANT, CITY OF BOSTON, FOR SUMMARY JUDGMENT (# 42)*

. COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Yves Dambreville instituted this action under the Fair Labor Standards Act (hereinafter, "FLSA" or "the Act") to recover overtime wages for weeks in which he allegedly worked in excess of forty hours while employed in the Mayor's Office of Neighborhood Services for the City of Boston. After an opportunity for extensive discovery, the defendant City of Boston filed the instant motion for summary judgment arguing that the plaintiff falls under the administrative employee and/or the personal staff exemptions to the Act and, therefore, the defendant is entitled to the entry of judgment as a matter of law. With the plaintiff having submitted a memorandum of law and other materials in opposition, the dispositive motion is now in a posture for decision.[1]

### II. THE RECORD ON SUMMARY JUDGMENT

The following evidentiary submissions shall be considered in deciding the motion for summary judgment: The Plaintiff's Answers To Defendant's First Set Of Interrogatories (# 40 Appendix To Motion Of The Defendant, City Of Boston, For Summary Judgment, Exh. B); the Deposition of Yves Dambreville (# 40, Exh. C); to the extent that they are not disputed, the Supplemental Response Of The Defendant, City Of Boston, To The Plaintiffs (sic) First Set Of Interrogatories (# 40, Exh. D); to the extent that it is undisputed, the Deposition of Michael L. Kineavy (# 40, Exh. E); to the extent that they are undisputed, facts set forth in the parties' Statement Of Material Facts (# 31); and to the extent that it is not contradicted by his deposition, the affidavit filed by Dambreville (# 46). When the term "record" is used hereinafter, it shall refer to this body of material.

Respecting Dambreville's affidavit, it should be noted at the outset that in both his memorandum in opposition (# 44) as well as his Local Rule 56.1 Statement (# 45), Dambreville relies on the affidavit which was submitted after his deposition had been taken and after the defendant's summary judgment motion had been filed. In comparable

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

circumstances, the First Circuit wrote as follows:

> Plaintiff also contends that summary judgment on the assumption of risk defense was improper because he presented a sworn affidavit in which he stated that he had no knowledge at the time of the accident of the ladder's propensity to slip. This evidence, submitted after defendants had filed their motions for summary judgment, stands in direct contradiction to his deposition testimony.

> When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed. 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2726, at 30–31 (2d ed. Supp.1994). *See Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993); *Trans–Orient Marine v. Star Trading & Marine,* 925 F.2d 566, 572–73 (2d Cir.1991); *Davidson & Jones Dev. v. Elmore Dev.,* 921 F.2d 1343, 1352 (6th Cir.1991).

*Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1 Cir., 1994); *see also Bohn v. Park City Group, Inc.,* 94 F.3d 1457, 1463 (10 Cir., 1996); *Flynn v. Menino,* 944 F.Supp. 81, 88 n. 14 (D.Mass., 1996); *Hayes v. Henri Bendel, Inc.,* 945 F.Supp. 374, 377 n. 5 (D.Mass, 1996).

Thus, to the extent that the plaintiff's affidavit is found to be directly at odds with his deposition testimony, it shall be disregarded for Dambreville has offered no explanation whatever to explain any incongruity.[2]

## III. FACTS

Yves Dambreville (hereinafter, "Dambreville") was a detective with the Boston Police Department from 1988 through at least March, 1994. (Statement of Material Fact, # 31 at 18, ¶ 1) While working as a detective, he was also active in helping communities organize crime watches and other neighborhood-based initiatives. Through this latter work he met then City Councillor Raymond Flynn (hereinafter, "Flynn" or "the Mayor"). (Appendix to the Motion of the Defendant, City of Boston, for Summary Judgment, # 40, Exh. C, Deposition of Yves Dambreville at 2) Flynn mentioned that he was impressed by Dambreville's work and later, after Flynn was elected Mayor of Boston, he recruited the plaintiff for a position as a coordinator and liaison in the Mayor's Office of Neighborhood Services (hereinafter, "the Office"). At a subsequent face-to-face interview, Dambreville accepted the Mayor's offer. (*Id.*) He then remained with the Office even after Flynn stepped down and Thomas Menino became Mayor of Boston. (*Id.* at 19)

The mission of the Office, which is comprised of seventeen staff members, including a director, associate director, two regional directors, seven coordinators, and six liaisons, is to "try to bring City Hall closer to the neighborhoods and to bring the neighborhoods closer to City Hall." (# 40, Exh. D, Supplemental Response Of The Defendant, City of Boston, To The Plaintiffs (sic) First Set Of Interrogatories at 4, ¶ 2 and 7, ¶ 2) As Michael L. Kineavy (hereinafter, "Kineavy"), the Director of the Office, stated in his deposition, although the Office is not the Mayor's formal policy making body, as is his cabinet, "[i]n terms of how the mayor formulates policy or gives directives, I would say in many instances people from the Office of Neighborhood Services help to shape that." (# 40, Exh. E, Deposition of Michael L. Kineavy at 2) Kineavy continued by explaining that although the Mayor's cabinet may assist him in developing broad policy for the city in general, it is the Office that helps the Mayor discern "what works and what doesn't" on the streets. (# 40, Exh. E at 3–4) "[H]e ... refers to us as his eyes and ears. He asks just directly [sic] people in supervisory positions and coordinators and liaisons what are you hearing, what are you seeing, what's going on, and at times that translates into the development of policy." (*Id.*)

Coordinators are each responsible for one or more neighborhoods and are expected to be the Mayor's "eyes and ears," to represent

---

**2.** I shall note when such a contradiction occurs. *See, e.g.,* discussion at pp. 392–93, *infra.*

him and to "speak on his behalf" in these areas. (# 40, Exh. C at 3, 5, 9, 10, 15, 19, and 23; Exh. D at 6, ¶ 9; and Exh. E at 16) In the plaintiff's words, coordinators generally "go out in the neighborhood and articulate the views, the philosophy of that administration, and to provide services to that constituency." (# 40, Exh. C at 19) The record suggests that coordinators have a significant amount of involvement and influence in their assigned neighborhoods. In Dambreville's deposition, for example, he mentions that at one point members of the Boston City Council were "outraged" with the Mayor's Office because they felt that:

the coordinator job was [sic] City Councillor job, we are taking the job away from them. They feel the constituency come [sic] to us instead of to them. The influence we had to get things done, they did not have that influence. They wanted to abolish that office because we were duplicating the work or they were duplicating our work.

# 40, Exh. C at 14.

Liaisons, rather than being charged with a geographically distinct neighborhood, are assigned to specific ethnic communities throughout the city. For example, the staff at the Office included liaisons to the Chinese, Cape Verdean, and other groups of a common linguistic or cultural heritage.

There is some disagreement regarding the characterization of Dambreville's day-to-day work, but on the record presented, there is no genuine dispute over any material fact. When he was hired, the plaintiff was made the Mattapan and Dorchester Neighborhood Coordinator and the Mayor's Liaison to the Caribbean and Haitian communities. (# 40, Exh. C at 2–3) Throughout his employment with the Office, Dambreville remained officially employed by, and drew his paycheck from, the Boston Police Department. (*Id.* at 11) However, during this period he was "detailed out" to the Office and at no point attended a police roll call at a Boston Police Department office. (*Id.* at 4; # 31 at 4, ¶¶ 9–11) For his work, Dambreville was paid in excess of $900 per week throughout the three years of this assignment. (# 38, ¶ 6; # 31, ¶ 41)

At his deposition, Dambreville indicated some of the reasons the Mayor was interested in hiring him to the Office and the expectations that would come with the job:

There were two people who had assumed the neighborhood coordinator [sic] for the Mattapan/Dorchester area [but] ... they were not able to provide the type of vision the Mayor wanted. They could not bring the people out of the communities together. And when the Mayor had [sic] conversation with me, he had seen my work in the past ... and see [sic] me working with the people and they trust me as a policeman, and asking [sic] me to represent him and to bring the community together, to attend the meetings and to speak on his behalf.

# 40, Exh. C at 3.

Much of what the record reveals Dambreville's actual work to have involved is consistent with the general description of coordinator and liaison responsibilities laid out above, as well as the expectations the Mayor set out at the job interview. He went into the community and regularly attended neighborhood meetings, representing the Flynn Administration by answering questions and gathering information about issues of concern to residents. It appears that the plaintiff not only attended these meetings but also had a hand in organizing them since a majority of the flyers and letters announcing the various meetings and events list him as a contact person. (# 40, Exh. B, Plaintiff's Answers To Defendant's First Set Of Interrogatories at 8, 12, 13, and 25) Moreover, the minutes of these meetings show that Dambreville frequently held the floor, · either answering questions regarding the Mayor's policies or making suggestions regarding specific issues.

On October 14, 1992, for example, a meeting was convened to discuss with members of a neighborhood association a real estate development proposal. A presentation was to be made by a representative from the Boston Redevelopment Authority and follow up questions were to be fielded by the developer of the property. After the two men were introduced to the audience, Dambreville ob-

jected. As the minutes from the meeting state:

> Yves said that the presence [of the two men] implicated two different deals, and he does not operate in this fashion. Yves further stated that he does not want anyone to think that he is making deals behind their backs and that both [of the men] were told by him that they must hold a community hearing regarding their proposed plans ... and they could not use this meeting to fulfill that requirement. He said he had particular concern because the abutters ... to the property were not present at this meeting and had not been notified of the plans of the developers and they must be included in the process.

# 40, Exh. B at 20.

Over this objection, the presentation was made and questions were answered. However, a full community hearing was scheduled for additional presentation to, and discussion with, the interested residents of the neighborhood. (*Id.*) The minutes of this particular meeting stand as an example of Dambreville exerting, or attempting to exert, influence at a neighborhood meeting. There are other such examples: The record contains minutes from several neighborhood meetings wherein Dambreville regularly and actively participated as the Mayor's representative. (# 40, Exh. B at 9–11, 17–18, 23–24, 26–30, and 32–34)

It is undisputed that on occasion the plaintiff personally represented the Mayor. For example, in a memorandum to his direct supervisor, Ann Maguire (hereinafter, "Maguire"), regarding the 9th Annual Mattapan Square Christmas Tree Lighting, Dambreville wrote: "In the absence of Mayor Thomas Menino, I carried out the tradition representing Mayor Menino and expressing to the audience his regrets for not being able to pull the light switch on this his first Christmas as Mayor of the City of Boston." (# 40, Exh. B at 41) He also noted in this memorandum that the event drew approximately 1,000 people and "was a success." (# 40, Exh. B at 41) Similarly, at his deposition the plaintiff testified about a Carribbean Cultural festival and banquet held in Franklin Park:

A: When I go to this banquet, I go on behalf of the Mayor and present a citation or proclamation, and that's a part of my work.

Q: And are there speakers at this banquet?

A: Yes. And if the Mayor cannot attend that, I would be the one who speak [sic] on his behalf or present the citation. If the Mayor show [sic] up, my job is to give the Mayor—before that he get [sic] a written briefing, and when he came to that, then he get [sic] a verbal briefing and know what form of address to use [sic] the people there.

# 40, Exh. C at 23.

In addition to working to "articulate the views, the philosophy of that administration," (*Id.* at 19) Dambreville reported back to the Office and the Mayor on issues that were of specific concern to residents. Although the parties seem to disagree about how frequently the plaintiff met with or personally advised the Mayor, there is no genuine dispute regarding the fact that a significant portion of Dambreville's job was to gather information and then pass it on to his supervisors, or to the Mayor directly, regarding Mattapan, Dorchester, and the Haitian and Caribbean communities. (# 40, Exh. C at 9–10; Exh. E at 15–16; Affidavit of Yves Dambreville # 46, ¶ 7)

Much of this information gathering was in an effort to service constituent concerns more efficiently. The plaintiff would, for example, assist members of the community in getting the city to support neighborhood cleanups or haul away abandoned automobiles. (# 46, ¶ 10) However, there is considerable evidence that the information Dambreville and the other neighborhood coordinators assembled was used to advise the Mayor generally regarding Boston's neighborhoods. While the plaintiff may not have directly formulated policy, he was expected to make recommendations based on his knowledge of the communities in which

he worked. (# 40, Exh. D at 8, ¶ 8)[3] It is uncontested, moreover, that when the Mayor had cause to go into either Mattapan or Dorchester, Dambreville would be, in effect, the Mayor's advance person. He would brief the Mayor on who was who, what issues were important to the constituents, and other relevant information. (# 40, Exh. C at 9; Exh. D at 8, ¶ 6;) In fact, when the Mayor's attention was generally required in an area of Dambreville's responsibility, the plaintiff was the individual who informed the Mayor regarding pertinent details and information. (# 40, Exh. C at 9; Exh. E at 16–17)

From all that appears, Dambreville does not dispute that the written reports which he regularly drafted were compiled, along with similar reports by other neighborhood coordinators and liaisons, into briefing books which the Mayor would read nightly. (# 40, Exh. E at 17–19) Furthermore, as mentioned above, Kineavy stated in his deposition that this information gathering function of the Office was intended to give the Mayor the resident expertise to know what issues were of importance to his constituents and how specific policies would work on the streets. (# 40, Exh. C at 9–10; Exh. E at 2–4)

The record reveals at least two instances of the Mayor having relied more explicitly on the plaintiff. On one occasion, Dambreville accompanied the Mayor on a several day trip to Washington, D.C. While it is unclear what the plaintiff's role was on this excursion, Dambreville did testify that while he was in Washington, he felt he was working twenty-four hours a day. (# 40, Exh. C at 22) The record also shows that the plaintiff attended, along with the other neighborhood coordinators, the Commissioner of Police, the Boston Police Department Command Staff, as well as the Mayor, a private screening of the movie Malcolm X prior to its Boston release. (*Id.* at 23) The purpose of the screening was to facilitate a discussion as to whether or not the film should be shown in Boston. The Mayor was concerned at the time that "this movie can be an explosion," and he called this group together to discuss with and advise him on the possible impact of its release. (# 40, Exh. C. at 23)

One of the starkest areas of dispute between the parties regards the access Dambreville had to the Mayor. However, viewing the record in its entirety and giving the non-moving plaintiff the benefit of all reasonable inferences, it appears that at a minimum he had access to the Mayor as conditions required. (# 40, Exh. D at 8, ¶ 7) For example, in his deposition, Kineavy explained that "[s]ometimes you could go in and grab the mayor. If the mayor was in a meeting, he might have to tell a secretary or [the Director of Operations], this is a hot issue, it looks like it's going to be a problem for the mayor, and I need to speak to [him] about it directly." (# 40, Exh. E at 14–15) Similarly, Dambreville stated at his deposition:

> [t]herefore, to interact with the Mayor is sometime [sic] which is quite often because our purpose out of the Neighborhood Services [sic] supposed to be the Mayor's eyes an [sic] ears if something went wrong, and that's my job to communicate that information to the Mayor.

# 40, Exh. C at 9.

Coordinators, then, it appears did not have a carte blanche to walk into the Mayor's personal office at any time. However, they had significant ability to capture the Mayor's attention as circumstances required. In other words, the amount of access a coordinator had to the Mayor generally correlated with how pressing the issues were in that coordinator's neighborhood. (# 40, Exh. E at 10–12) Dambreville himself testified:

> Affidavit, # 46 at 8, ¶ 9.
> In my view, the fair inference from his deposition is otherwise. (# 40, Exh. C at 9–10) However, out of an abundance of caution, I shall not rest my decision on the fact that Dambreville made "recommendations concerning City policy or advising the Mayor about changes in City policy."

---

3. The plaintiff denies this in his affidavit, stating: I could and did raise questions about the City's delivery of services, but I was not responsible, either formally or informally, for making recommendations concerning City policy or advising the Mayor about changes in City policy. I had no responsibility in this position for formulating policies, either for the City as a whole, or for any particular City services.

390

Q: Now, when you worked in the Mayor's office ... did you meet with Mayor Flynn?

A: Several occasions, yes.

Q: During the time that you worked in the Mayor's office, how often whether weekly or monthly, anyway you can describe it, how often would you meet with Mayor Flynn?

A: During the course I was there?

Q: From the period of time when Ray Flynn was the Mayor.

A: Many, many, many times.

# 40, Exh. C at 9.

## IV. SUMMARY JUDGMENT STANDARD

The summary judgment standard in this Circuit is familiar. When considering the propriety of the entry of summary judgment, the Court must determine whether:

... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court is to examine the materials presented "in the light most favorable to the non-moving party and indulge all inferences in that party's favor." *Moody v. Boston and Maine Corporation*, 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1 Cir., 1994).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine" the court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.; see also National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff*, 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual

dispute is "material" the Court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *National Amusements*, 43 F.3d at 735; *Vasapolli*, 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

The plain language of Rule 56(e) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also National Amusements*, 43 F.3d at 735.

Moreover:

[e]ven in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*Rivera–Cotto v. Rivera*, 38 F.3d 611, 613 (1 Cir., 1994) quoting, *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 8 (1 Cir., 1990); *see also Mesnick v. General Electric Company*, 950 F.2d 816, 822 (1 Cir., 1991).

## V. DISCUSSION

Turning now to the merits of the motion, as explained by the First Circuit:

The overtime provisions of the FLSA establish the general rule that employees must be compensated at a rate of not less than one and one-half times their regular rate for all overtime hours. 29 U.S.C. § 207(a)(1). Overtime is defined as any employment in excess of 40 hours in a single workweek. *Id.*

Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1070 (1 Cir., 1995).

The Fair Labor Standards Act does, however, incorporate numerous exemptions to that general rule. 29 U.S.C § 213. Cases interpreting the FLSA have determined that these exemptions are to be construed narrowly against the employer. *See, e.g., Reich v. State of New York,* 3 F.3d 581, 586 (2 Cir.), *cert. denied,* 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994); *Nichols v. Hurley,* 921 F.2d 1101, 1103 (10 Cir., 1990). However, employees found to be exempt are not granted the protection and benefits of the Act. As grounds for its summary judgment motion, the City of Boston argues that Dambreville falls under the administrative and/or personal staff exemptions, and, consequently, as a matter of law it was not required to pay him overtime compensation for any week in which he may have worked more than forty hours.

Beginning first with an analysis of Dambreville's employment as a bona fide administrative employee, the implementing regulations of the FLSA delineate both a "short" and a "long" test for determining whether such an employee is exempt. *Shockley v. City of Newport News,* 997 F.2d 18, 28 (4 Cir., 1993); *Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800, 805 (11 Cir., 1991); *Reich v. Haemonetics Corporation,* 907 F.Supp. 512, 515 (D.Mass., 1995). The so-called short test applies to those employees such as Dambreville who earn in excess of a threshold amount of $250 per week.

■ The pertinent regulation reads:

[p]rovided, [t]hat an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week ... and whose primary duty consists of the performance of [office or nonmanual work directly related to management policies or general business operations of his employer], which includes work requiring the exercise of discretion and independent judgment

[shall be exempt from coverage under the FLSA]...

29 C.F.R. § 541.2(e)(2).

Thus, there are three elements of the bona fide administrative employee exemption, namely: (1) that plaintiff was primarily engaged in nonmanual work; (2) that plaintiff's work was directly related to the management policies or general business operations of the Flynn and Menino Administrations; and (3) that plaintiff's work included that which required the exercise of discretion and independent judgment. The burden is on the defendant to show that each of these elements was present in Dambreville's employment. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

■ The regulations make clear that "[t]he requirement that the work performed by an exempt administrative employee must be office work or nonmanual work restricts the exemption to 'white-collar' employees who meet the tests." 29 C.F.R. § 541.203(a). As it is uncontested that Dambreville's employment was comprised almost entirely of office work, i.e., meetings and paperwork, this first element is plainly met.

The undisputed facts evidence that the next element of the exemption, i.e., that the plaintiff perform work which is "directly related to the management policies or general business operations" of the mayoral administrations for which he worked, is also fulfilled.[4] The Act's implementing regulations provide that this "phrase limits the exemption to persons who perform work of *substantial importance* to the management or operation of the business of his employer." 29 C.F.R. § 541.205(a) (emphasis added). The regulations then state that work involved in "servicing" a business would satisfy this requirement. Such "servicing" work includes, "advising the management, planning, negotiating, representing the company," etc. 29 C.F.R. § 541.205(b). Moreover:

4. As a general observation, it should be noted that:

[a]lthough ... the terms used in the regulations are general business terms and ... analogies between business and government often

are somewhat strained, the general principles and rationales underlying the regulations are instructive in a government context ...

*Bratt v. County of Los Angeles,* 912 F.2d 1066, 1070 (9 Cir., 1990).

the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is *"directly related"* to management policies or to general business operations include those whose work *affects* policy or whose responsibility it is to *execute* or *carry it out.*

29 C.F.R. § 541.205(c) (emphasis added). *See Reich v. John Alden Life Insurance Co.,* 940 F.Supp. 418, 421–23 (D.Mass., 1996).

This is true "even though [the exempt administrative employee's] assignments are tasks related to the operation of a particular segment of the business." 29 C.F.R. § 541.205(c).

Based upon the record, it appears that the Office, with its staff of coordinators and liaisons, was nothing more nor less than the Mayor's presence in the city's various neighborhoods as well as its varied ethnic communities. Viewed in this light, each coordinator and liaison operated very much like the Mayor's ambassador. Every outreach staff person had the two-fold duty of both representing the administration in the neighborhoods and of reporting back to the administration what was happening in the neighborhoods.

As statements by Maguire and Kineavy indicate, the Office's goal was to "try to bring City Hall closer to the neighborhoods and to bring the neighborhoods closer to City Hall." (# 40, Exh. D at 4, ¶ 2) According to Dambreville "our purpose out of the Neighborhood Services supposed [sic] to be the Mayor's eyes an [sic] ears if something went wrong, and that's my job to communicate that information to the Mayor." (# 40, Exh. C at 9) The Mayor looked to the expertise of the coordinators and liaisons, as well as the neighborhood specific information developed by the Office's staff, to assist him generally in formulating policy. (# 40, Exh. D at 4, ¶ 2; 5, ¶ 8; and 8, ¶¶ 8,9; and Exh. E at 3–4, 6–7) It is repeatedly stated throughout the record that the Mayor relied on his coordinators and liaisons to be his "eyes and ears." (# 40, Exh. C at 3, 5, 9, 10, 15, 19, 23; Exh. D at 6, ¶ 9; and Exh. E at 16) Given

these undisputed facts, it appears evident that the Office and its staff were instrumental in "servicing" the mission of the Flynn and Menino Administrations.

With respect specifically to Dambreville, in his affidavit the plaintiff attempts to characterize his work as primarily clerical and of little importance to the functioning of the mayoral administrations. As compared with his deposition, Dambreville downplays his job by emphasizing its more mundane aspects. For example, the plaintiff states that he merely reported on "available City services and policies" and relayed "neighborhood concerns ... to those who were responsible for dealing with those matters," that he was not a member of the Mayor's "inner circle of advisers," that his written reports regarding neighborhood concerns "did not routinely result in a meeting with the Mayor," and that although he did meet with the Mayor "on many occasions" over the span of his nine years with the Office, "[t]hese meetings were on an irregular basis and occurred when there was a particular issue" affecting his neighborhoods or the Haitian or Caribbean communities. (# 46, ¶¶ 2, 5, 7, 13)

The plaintiff's affidavit is precisely crafted in an apparent attempt to delimit his job. Read carefully however, in large part the statements do not directly address, or refute, the evidence presented by the defendant. For example, the fact that the plaintiff's "written reports went to the director (of the Office) and did not routinely result in a meeting with the Mayor" does not challenge the defendant's evidence that the written reports of the coordinators were regularly put in a briefing book read by the Mayor each night or that Dambreville had access to the Mayor as circumstances within his realm of responsibility required. Moreover, other statements such as the fact that Dambreville "was definitely not part of the Mayor's inner circle of advisors" or that "[t]he Mayor did not directly supervise my activities on a day-to-day basis" are neither contradictory to the defendant's evidence nor dispositive on any relevant issue. In short, accepting each of these statements as true, Dambreville's affidavit is insufficient to create a genuine issue of material fact regarding this element of the

test particularly when considered in conjunction with his deposition and answers to interrogatories.

During his deposition, the plaintiff repeatedly referred to himself as the Mayor's "eyes and ears" and regularly stated that his role was to "advise" the Mayor. (# 40, Exh. C at 3, 5, 9, 10, 15, 19, 23–24) Perhaps the statement that most undercuts the plaintiff's characterization of his position in his affidavit is his comment at his deposition regarding the City Council's "outrage" with the Mayor's office because they felt the unelected coordinators had more "influence" with their constituents than they did. (# 40, Exh. C at 14) In other words, the City Council did not share his view that his job was merely clerical and of little importance. Further belying the plaintiff's characterization is his recollection of the Mayor's expressed disappointment with the people who previously held Dambreville's job. (# 40, Exh. C at 3) These two people, Dambreville testified, "were not able to provide the vision the Mayor wanted. They could not bring the people of the communities together." (*Id.* at 14)

In addition, the defendant has submitted several exhibits apparently appended by the plaintiff to his answers to interrogatories showing the range of responsibilities entrusted to Dambreville together with the degree of initiative he took in performing them. The plaintiff regularly and actively participated as a representative of the city's administration in community meetings. Furthermore, his name appears as a contact person in organizing these meetings. (# 40, Exh. B at 8–41) When the Mayor had reason to come to Mattapan or Dorchester, Dambreville was the executive's advance person and advisor in the field. He personally represented Mayors Flynn and Menino at public ceremonies and banquets, on occasion speaking on behalf of the absent Mayor. Also, Dambreville was specifically asked to attend a private screening of Malcolm X and advise the Mayor on how release of the movie might affect his communities.

In essence, Dambreville directly contradicts the defendant's position on only one point, asserting that he had no responsibilities, "either formally or informally, for making recommendations concerning City policy or advising the Mayor about changes in City policy" nor "for formulating polices." (# 46, ¶ 9) *See* Footnote 3, *supra*. Even this statement, however, does not raise a genuine issue of a material fact. The regulations defining the administrative exemption cover not just the primary policy advisers and formulators, but also those employees "whose work affects policy or whose responsibility it is to execute or carry it out." 29 C.F.R. § 541.205(c). Moreover, neither this statement nor any other made by Dambreville, effectively refutes the City of Boston's evidence supporting the contention that his work was "directly related" to city policy as defined by regulation.

Considering all of the record evidence, it is beyond doubt that the work involved in the plaintiff's job as a coordinator and liaison with the Office was "servicing" the mayoral administrations of Boston. The plaintiff argues to the contrary, claiming that he was involved in the day-to-day production processes of city government, an argument which, if proven, would prevent Dambreville's employment from satisfying the short test. *See* 29 C.F.R. § 541.205(a). To bolster his position, he references the list of job titles cited in the regulations. However, the emphasis in the regulations is to provide guidance in terms of responsibilities and job characteristics rather than a nonexhaustive list of qualifying job titles.

Therefore, based upon the summary judgment record as defined and giving all reasonable inferences to the non-moving plaintiff, the unrefuted evidence supports the conclusion that Dambreville "serviced" the Flynn and Menino administrations by publicly representing the chief executive and speaking on his behalf, by doing the requisite legwork to assist in the crafting of executive policy, and by periodically advising the Mayor, either orally or by written report. Although his advisory capacity may not necessarily have included regularly suggesting specific policy initiatives, his role in the Office was to be the Mayor's resident expert on, and contact with, the communities in which he worked. (# 40, Exh. C at 3, 5, 9, 10, 15, 19, 23–24; Exh. D at 8, ¶ 8) Accordingly, the

defendant has established that there is no genuine issue of material fact that Dambreville was primarily engaged in work that was of substantial importance to the Flynn and Menino Administrations and was directly related to their management policies and general operations.

Finally, according to the third element of the "short" test as prescribed by FLSA's implementing regulations, an administrative employee must perform "work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.2(e)(2).[5] As a general matter, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). This requirement "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a).

The types of decisions typically made by clerical workers would not qualify as an exercise of discretion or independent judgment under the Act. 29 C.F.R. § 541.207(d)(2). However:

> [t]he term does apply to the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility ... The[se] regulations ... however, do not require the exercise of discretion and independent judgment at so high a level. The[se] regulations ... also contemplate the kind of decision and independent judgment exercised by an administrative assistant to an executive, who without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required.

29 C.F.R. § 541.207(d)(2).

Lastly, the FLSA does not require that a sufficient exercise of discretion and independent judgment "have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.207(e)(1). It simply is not necessary that the decision made by the employee be the one that carries the day. For example, the regulations cite as an exercise of discretion and independent judgment an employee's work in "answering correspondence and ... deciding which replies may be sent out without review by" the executive for whom the individual works. *Id.*

The plaintiff argues that his job did not involve such discretion and independent judgment. To this end, Dambreville likens the lack of discretion inherent in his job to that found in the jobs of several plaintiffs in the *Shockley* case. Therein, the court concluded that the plaintiff Media Relations Sergeants of the Newport News Police Department did not qualify as exempt administrative employees under the FLSA since they "generally lacked the discretion necessary under the regulations." *Shockley,* 997 F.2d at 29. The court noted that:

> [t]hese officers spent half their time on the "crime line," answering the phone, taking tips, and passing them on to the right department. The remainder of their time was spent on various responsibilities including screening calls to the Chief of Police, responding to impromptu questions by the press, determining what information should be released to the press regarding ongoing investigations, and developing an ongoing news broadcast called "Crime of the Week."

*Shockley,* 997 F.2d at 28.

Dambreville contends that his work consisted of gathering information on citizens' concerns and passing it on to his supervisors or contacting other staff in appropriate city departments. He argues that in this function he, like the Sergeants in the City of Newport News, "did not use independent judgment" and that much of his work involved only

5. It should be noted that this is a more liberal standard than that set out in the "long" test which only exempts an employee who "*customarily and regularly* exercises discretion and independent judgment." 29 C.F.R. § 541.2(b) (em-
phasis added). *See Clark v. J.M. Benson Co., Inc.,* 789 F.2d 282, 285 n. 1 (4 Cir., 1986); *Donovan v. United Video, Inc.,* 725 F.2d 577, 581 n. 4 (10 Cir., 1984); *Dymond v. United States Postal Service,* 670 F.2d 93, 95 (8 Cir., 1982).

"routine judgment." (# 46, ¶¶ 8, 10) Thus, according to Dambreville, his job does not satisfy this element of the administrative exemption test.

The record in this case quite simply does not support the plaintiff's contention. In *Shockley*, the court based its decision on the strict limitations placed upon the plaintiffs with respect to exercising any discretion. Specifically, the court wrote:

> [i]n screening the Chief of Police's calls, only preapproved questions were asked, and only preapproved answers were given. The information the sergeants released to the public was determined according to state law and highly detailed guidelines.

*Shockley*, 997 F.2d at 29.

Although in his affidavit, the plaintiff avers that "I did not use independent judgment in deciding which issues were of concern to citizens" and "I exercised no discretion in deciding what those (the City's) policies were", such statements miss the mark under the regulations and the caselaw. Dambreville has presented no evidence showing that he operated within similarly narrow parameters to counter the defendant's presentation. In fact, the vast majority of the record, including his deposition testimony, speaks to the contrary. From all that appears, the plaintiff was given significant leeway in the performance of his job. Indeed he testified that the Mayor hoped he would have "vision" and be able to "bring the people out of the communities together." (# 40, Exh. C at 3) It seems beyond cavil that the plaintiff was using discretion and independent judgment when acting as the Mayor's "representative."

Moreover, the regulations specifically portray an employee who "without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required" as exercising sufficient discretion and independent judgment. 29 C.F.R. § 541.207(d)(2). This regulation seems to match precisely what was expected of Dambreville in the execution of his job and, more importantly, how he actually carried out his job. Dambreville proffers no evidence indicating that he had to follow "specific instructions or prescribed procedures" as the regulations require. Rather, in describing the guidance he was given, Dambreville uses only general terms. For example, in his deposition he stated:

Q: Okay. Did they assign you some task?

A: Right. Sometimes if there is some issues [sic] out of [sic] the neighborhood, such as a school when the Mayor was trying to dismantle the elected body to the appointed body, we have duties to go organize the neighborhood and organize meetings. If there is a development issue, our job is to go up there and do the damage control, organize the meeting, and do whatever is required of us.

# 40, Exh. C at 13.

The evidence supports the conclusion that the plaintiff not only did exercise, but was expected to exercise fairly broad discretion in the performance of his duties. Certainly, he exercised sufficient discretion to satisfy the regulatory requirement under the "short" test for the administrative exemption.

In sum, the City of Boston has submitted sufficient evidence to prove that no genuine issue of material fact exists with respect to whether Dambreville's employment with the Mayor's Office of Neighborhood Services met the requirements of the bona fide administrative employee exemption to the FLSA. Because the plaintiff's job is exempted from the provisions of the Act, Dambreville has no claim for overtime wages as a matter of law and the defendant is entitled to the entry of judgment in its favor. Having reached this conclusion, there is no need to undertake an analysis of the plaintiff's employment under the personal staff exemption.

## VI. CONCLUSION AND ORDER

Accordingly, for all of the reasons stated above, it is ORDERED that the Motion of Defendant City of Boston for Summary Judgment (# 42) be, and the same hereby is, ALLOWED. Judgment shall enter for the defendant.