Robert J. KAVANAGH, Plaintiff,

v.

CITY OF PHOENIX, Defendant.

Eric Edwards, Plaintiff,

v.

City of Phoenix, Defendant.

Nos. Civ.A. 98–0377–PHXSMM, Civ.A. 98–0378–PHXSMM.

United States District Court, D. Arizona.

March 2, 2000.

MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

I. *Introduction*

These two related cases originally came before the Court upon cross motions for summary judgment. Following the lead of my distinguished colleague, Judge Robert Keeton, "it is my practice to discourage cross-motions [for summary judgement] and encourage, in their stead, a trial, mostly or entirely on stipulated facts." Robert E. Keeton, *Keeton on Judging in the American Legal System* (Lexis, 1999) 428. The advantage of this "case stated" procedure is that the Court can draw reasonable inferences from the totality of the agreed upon facts without having to draw inferences adverse to each moving party in turn, as is required by summary judgment practice. *Id.* at 429–33. Counsel here have embraced this procedure after notice and have thoroughly, skillfully, and professionally exploited it.

Substantively, these cases arise under the Fair Labor Standards Act (the "Act"), *see* 29 U.S.C. § 207(a)(2), and an Arizona statute which provides overtime compensation for certain law enforcement activities, *see* A.R.S. § 23–392. Each of the plaintiffs, Robert Kavanagh ("Kavanagh") and Eric Edwards ("Edwards"), contends that he is entitled to overtime compensation under both the Act and the Arizona statute. The City of Phoenix (the "City") argues in response that neither Kavanagh nor Edwards is entitled to overtime because each is an exempt employee not covered by the statutes.

II. *Factual Background*

Kavanagh is the head of the Phoenix police department's legal unit. *See* City Statement of Facts Regarding Pl. Kavanagh ¶¶ 19, 31 ("City SOF [Kavanagh]"). He is a graduate of the Arizona State University Law School and a member of the Arizona bar. *See id.* at ¶¶ 13, 15. He spends approximately 70% of his time pro-

---

1. Of the District of Massachusetts, sitting by designation.

viding legal advice, 25% of his time acting as a liaison between the Police Department, the City's Law Department, and outside law firms to coordinate the defense of lawsuits against the Police Department, 4% of his time conducting training for City employees, and 1% of his time appearing in court in defense of the Police Department and its employees. *See id.* at ¶ 40. He describes his major job duties as (1) providing legal advice to the Police Department, (2) providing training, (3) reviewing subpoenas for Police Department documents, (4) overseeing Legal Unit publications, (5) advising executive staff on legal issues, and (6) acting as a liaison to the City's Law Department. *See id.* at ¶ 42.

Kavanagh claims to have been classified by the City as falling within its "Police Supervisory and Professional" category of employees. *See* Kavanagh Statement of Facts at ¶ 2 ("Kavanagh SOF"). The City's Compensation and Benefits Guide states that Police Supervisory and Professional employees are entitled to overtime compensation at one and one half times their regular pay rate. *See id.* at ¶ 4. In addition, Kavanagh's leave requests are done in hourly increments, *see id.* at ¶ 9, and his sick time, vacation time and compensation time appear in hours on his pay stub and leave report, *see id.* at ¶¶ 11, 12. The City contends, however, that all City pay stubs, for both exempt and non-exempt employees, report sick time, vacation time and compensation time in hourly increments because the City's payroll computer requires it. *See* City SOF (Kavanagh) at ¶ 25. Kavanagh receives approximately $77,000 per year in compensation, paid bi-weekly and regardless of the number of hours actually worked during the pay period. *See id.* at ¶¶ 20–21. Kavanagh is allotted 14 hours of "compensatory time" by the City's payroll computers at the beginning of each year which then converts to vacation hours. *See id.* at ¶ 23.

In July, 1994, when Kavanagh was promoted to the position of Lieutenant, Law Specialist, he was placed at Step 6 of the City's pay scale. *See id.* at ¶ 55. In May, 1996, Patti Zins ("Zins"), the Police Fiscal Administrator, concluded that Kavanagh should have been placed at Step 3 of the City's pay scale, a mistake that resulted in Kavanagh's receiving $17,000 that the City believes he was not owed. *See id.* at ¶¶ 55, 57. To remedy the problem, the City decided to maintain Kavanagh at Step 7 of the pay scale (the point to which he had advanced from the mistaken Step 6) until such time as he would have progressed to Step 7 if he had been placed at Step 3 from the beginning. *See* City SOF (Kavanagh) at ¶¶ 55, 57. Kavanagh discussed this matter with Zins, Phil Kundin ("Kundin"), the Assistant Personnel Director for the City, and Ernie Bakin ("Bakin"), his immediate supervisor. *See id.* at ¶ 63. He did not appeal the decision of the Police Department to the City Manager. *See id.* at ¶ 62.

Edwards is a sworn police officer with the City of Phoenix Police Department. *See* Edwards Statement of Facts at ¶ 1 ("Edwards SOF"). He attended law school between 1992 and 1995, graduating in December of 1995. *See* City SOF Regarding Pl. Edwards at ¶¶ 7–11 ("City SOF [Edwards]"). In February, 1996, Edwards was promoted to the position of Sergeant and was assigned to the Police Department's Legal Unit. *See id.* at ¶ 13. In May, 1996, Edwards was sworn into the Arizona Bar and became a Legal Specialist within the Legal Unit. *See id.* at ¶ 14.

Like Kavanagh, Edwards claims to have been classified by the City as falling within its "Police Supervisory and Professional" category of employees, *see* Edwards SOF at ¶ 2, thereby becoming entitled to overtime compensation at one and one half times his regular pay rate. *See id.* at ¶ 4. Accounting for the incidents of Edwards' employment is done in the same hourly increments as is the case with Kavanagh, *see id.* at ¶¶ 8, 10, 11. Edwards receives approximately $65,000 per year in compensation, paid biweekly regardless of the number of hours actually worked during

the pay period. *See* City SOF (Edwards) at ¶ 15.

Edwards' principal duties are: (1) providing legal advice to the Police Department in general; (2) providing training at recruit and in-service levels; (3) ensuring that all subpoenas for Police Department documents are reviewed; (4) overseeing Legal Unit publications; (5) lobbying the Arizona Legislature on behalf of the Police Department; and (6) coordinating the Police Department's lobbying efforts within the City's Intergovernmental Program. *See id.* at ¶ 27. He estimates that approximately 60% of his actual time is spent lobbying on behalf of the Police Department and 30% providing legal advice to the Department. *See id.* at ¶ 30. Prior to 1998, Edwards estimated that 45–50% of his time was spent providing legal advice and 45–50% lobbying. *See id.* at ¶ 32. Edwards relies on his law training when he performs as a lobbyist at the Arizona Legislature. *See id.* at ¶ 37. He does not require the approval of a superior in determining the issues upon which he will focus his lobbying efforts. *See* City SOF (Edwards) at ¶ 46. Edwards is, however, required by the City to be available in uniform on New Year's Eve, 1999, *see* Edwards SOF at ¶ 13, and he is required to attend all mandatory training for police sergeants, *see id.* at ¶ 17. Edwards is also subject to the jurisdiction of the police department's Disciplinary Review Board rather than the Executive Review Board. *See id.* at ¶ 9; Kundin Dep. 72:15–19. The City contends that the Disciplinary Review Board is prohibited from suspending exempt employees in less than full week increments. *See* City SOF (Edwards) at ¶ 24.

### III. *Discussion*

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Kavanagh and Edwards argue that they are not exempt employees under the Act and therefore should be entitled to overtime pay at the rate of one and one half times their regular pay rate under A.R.S. § 23–392(A)(1).[2] In the alternative, they argue that they should be entitled to overtime compensation at their regular rate of pay under A.R.S. § 23–392(A)(2). The City contends that both Kavanagh and Edwards are exempt employees under the Act because each fits the "professional," "executive," and "administrative" exceptions to the Act's overtime requirements. Thus, the City argues, Kavanagh and Edwards are not entitled to time-and-a-half overtime pay. Moreover, the City argues that Kavanagh and Edwards are not entitled to overtime pay at their regular rates either, given the exception under A.R.S. § 23–392(B) for employees that fit the "administrative" or "executive" exemptions.

### A. *The Fair Labor Standards Act*

Kavanagh and Edwards argue that the City has treated them as hourly rather

---

**2.** A.R.S. § 23–392 provides:

 A. Any person engaged in law enforcement activities shall be compensated for each hour worked in excess of forty hours in one work week at the option of such employer at the following rates:

 1. One and one-half times the regular rate at which such person is employed or one and one-half hours of compensatory time off for each hour worked if by the person's job classification overtime compensation is mandated by federal law.

 2. If by the person's job classification federal law does not mandate overtime compensation, the person shall receive the regular rate of pay or compensatory leave on an hour-for-hour basis.

 B. ... The term 'person engaged in law enforcement activities' shall not include any such person employed in a bona fide executive or administrative capacity as defined by the employer.

than as salaried employees based upon a variety of evidentiary factors. First, they argue that their pay stub list their accrued vacation time, sick time, and compensation time in hourly increments. The City avers, and neither Kavanagh nor Edwards disputes, that the City's payroll computer must process the vacation and sick time of all employees, both exempt and non-exempt, in hourly figures. *See* City SOF (Kavanagh) at ¶ 25, City SOF (Edwards) at ¶ 20. Kavanagh and Edwards still accrue these benefits on a daily basis, despite the fact that they are reported hourly.

Second, Kavanagh and Edwards argue that they fall under the "Police Supervisory and Professional" category of the City's 1995–96 Compensation Benefits Guide. They make no effort to demonstrate why they should be so classified, nor whether they ever actually have been so classified. Moreover, they make no effort to argue that the classification, even if it had occurred, would be controlling for purposes of the Act.[3]

Third, Kavanagh and Edwards argue that they report their leave in hourly increments. Kavanagh, however, has always reported his use of paid absence time in hourly units that total one or more full working days, and Edwards, with one exception, has done the same. *See* City Supplement Statement of Facts at ¶ 2. Likewise, their sick, personal, and vacation time is not decreased on account of half-day absences, unlike the City's nonexempt employees. *See* City SOF (Kavanagh) at ¶ 26. Moreover, even if Kavanagh and Edwards were correct that their leave occurred in hourly increments, it would not defeat the exemption for professional, administrative or executive employees. *See Boykin v. Boeing Co.*, 128 F.3d 1279, 1281–82 (9th Cir.1997) ("The DOL has unequivocally and consistently declared that additional compensation in the form of hourly overtime payment does not defeat exempt status under the salary-basis test."); *Barner v. City of Novato*, 17 F.3d 1256, 1261–62 (9th Cir.1994) (deductions of less than one day from paid absence reserves do not constitute deductions from salary and, therefore, do not jeopardize the exemption). Fourth, Kavanagh and Edwards argue that since other police lieutenants and sergeants perform "administrative" tasks and are classified as non-exempt, they must, therefore, be non-exempt as well. *See* Kavanagh Reply at 2–3 (describing duties of non-exempt Lieutenant Yost); Edwards Reply at 2–4 (describing duties of non-exempt Sergeant Lane). This argument fails to acknowledge the fundamental differences in job functions between Kavanagh and Edwards, Law Specialists who spend the majority of their time either providing legal advice or, in the case of Edwards, lobbying; and the Phoenix police lieutenants and sergeants who perform tasks typically associated with law enforcement officers, even if certain lieutenants are also required to supervise a department. *See* City SOF (Edwards) at ¶¶ 40–43. Quite simply, Edwards' comparison is meaning-

---

**3.** Kavanagh and Edwards repeat this mistake in arguing that the City considered them non-exempt based on their educational reimbursement policies. The City offered two different classifications, one for "administrative, supervisory, professional and technical employees," and one for "Sergeants and Lieutenants of the Police Department." Kavanagh and Edwards were each told that they would fall into the latter classification. *See* Kavanagh Mem. at 8; Edwards Mem. at 9–10. Kavanagh and Edwards apparently believe that this internal classification for purposes of the educational benefit means that they cannot be "administrative" or "professional" for purposes of the Act. Those terms, however, have a special meaning under the Act, and Kavanagh and Edwards must do more than point to a single instance in which other employees are described as "administrative" or "professional" in a way that they are not. At the very least, they must demonstrate that the terms are being used by the City in the specialized sense that obtains under the Act. The only evidence in the record, however, contradicts this hypothesis: the City states that both Kavanagh's and Edwards' classification was necessary because each is a sworn officer and all sworn employees fall under the second classification. *See* City's Supplemental Statement of Facts at ¶ 3.

less, as evidenced by the following statement of Robert Kavanagh (Edwards' direct supervisor and co-plaintiff): Edwards' "duties and responsibilities are unlike those of any other Sergeant in the Department." *Id.* at ¶ 43.

Fifth, Kavanagh and Edwards argue that Zins circled a section corresponding to hourly employees on a benefits document in reference to each of them. *See* Kavanagh at SOF ¶ 13; Edwards SOF at ¶ 12. She has since testified that this action was in error. *See* City Reply Mem. for Pl. Edwards at 6.

Sixth, Kavanagh and Edwards argue that they are subject to the authority of the City's Disciplinary Review Board, rather than the Executive Review Board (which has jurisdiction over certain exempt City administrative commanders and chiefs). Neither makes any attempt to argue that the Disciplinary Review Board deals exclusively with non-exempt employees. Nor does either attempt to show how the disciplinary mechanism selected by the City has any bearing on whether he is non-exempt under the Act. They do note that one prior Law Specialist was suspended by the Disciplinary Review Board for less than one full payweek for a disciplinary infraction. *See* Edwards Reply at 4. The Supreme Court has stated, however, that absent a "significant likelihood" that officers such as Kavanagh and Edwards would have their pay reduced for disciplinary reasons, they are still considered salaried for purposes of the Act. *See Auer v. Robbins,* 519 U.S. 452, 461–62, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (given that only one officer was actually subjected to a pay reduction under disciplinary procedure, "significant likelihood" of pay decrease did not exist such as to jeopardize salaried status); *see also Childers v. City of Eugene,* 120 F.3d 944, 946 (9th Cir.1997) (employees' exempt status not jeopardized by disciplinary policy which nominally subjected them to unpaid disciplinary suspensions of less than one week).

Seventh, Kavanagh and Edwards argue that they receive compensation time on an hourly basis. Actually, they receive a lump-sum of fourteen compensation hours at the beginning of each year which immediately convert into vacation hours. The compensation time is not related in any way to the number of hours either Kavanagh or Edwards works. *See Boykin,* 128 F.3d at 1280–81 (additional compensation besides a salary is not inconsistent with the salary basis of payment).

Finally, Kavanagh and Edwards argue that they are required to attend all mandatory training for police lieutenants and sergeants and that they are required to take action if they happen to observe felonious conduct while on duty. These minor similarities between Kavanagh and Edwards and non-exempt police officers cannot suffice to render them non-exempt for purposes of the Act. Kavanagh devotes 95% of his time providing legal advice and coordinating legal actions, and Edwards spends 90% of his time lobbying and providing legal advice. Therefore, mandatory training and observed felonious conduct do not constitute more than a *de minimis* portion of their job duties.

As can be seen, Kavanagh and Edwards devote a great deal of attention to evidentiary minutia that might, in some strained sense, tangentially support the notion that the City viewed them as non-exempt employees. Neither devotes any attention to the underlying (and controlling) question whether the nature of their job duties render them an "employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).[4]

■ As the City effectively argues, both Kavanagh and Edwards can be considered professional employees for purposes of the Act. One is considered a professional em-

---

4. Indeed, Edwards states precisely the opposite in his brief: "[T]he particular job duties are not the determining factor in whether an employee is exempt or non-exempt, but rather, how the city treats the employee." Edwards Mem. at 9.

ployee if she earns not less than $250 per week, performs duties or tasks that require the consistent exercise of discretion and independent judgment, and has as her "primary duty" work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study. *See* 29 C.F.R. § 541.3(a)(1), 541.3(b), 541.3(e). The regulations appear to assume (quite rightly) that the practice of law is one of the professions which make an employee eligible for the professional exemption. *See* 29 C.F.R. § 541.301(e)(1) (exempting practitioners of law from $250 per week salary requirement). Thus, Kavanagh is a "professional" under pertinent regulations because he spends 70% of his time providing legal advice. *See* 29 C.F.R. § 541.3(a)(1).

■ Edwards has testified that he spends 30–34% of his time providing legal advice and 60% lobbying. *See* City SOF (Edwards) at ¶ 30. He admits that his lobbying efforts require him to utilize the skills he learned in law school. *See id.* at ¶ 37. Edwards receives little supervision when performing his role as a Law Specialist. On many work days, Kavanagh, Edwards' direct supervisor, does not even see Edwards. *See id.* at ¶ 45. Kavanagh has only observed Edwards providing legal training on one occasion and has never observed Edwards when he appears in court on behalf of the Police Department. *See id.* at ¶ 50. Edwards makes his own decisions about how and where to focus his lobbying efforts. His supervisor commented that, with respect to Edwards' lobbying, he "[doesn't] know what he's doing out there." *See id.* at ¶¶ 46–47. These facts place Edwards within the professional exemption and defeat his claim for overtime compensation under the Act.

■ Similarly, in Kavanagh's case, an employee who is compensated on a salary basis at a rate of not less than $250 per week falls within the administrative exemption if her primary duty consists of "the performance of office or nonmanual work directly related to the management policies or general business operations of [her] employer or [her] employer's customers," and if she "customarily and regularly exercises discretion and independent judgment." 29 C.F.R. § 541.2(b). Activities which are "directly related to the management policies or general business operations" of an employer include: advising management, representing the company, negotiating, analyzing data and drawing conclusions, and making recommendations. 29 C.F.R. § 541.205(b). Kavanagh is an "administrator" because he spends the bulk of his time dispensing legal advice, which constitutes "analyzing data and drawing conclusions" and "making recommendations"; he acts as a liaison between the police department, the City's Law Department and private law firms, and serves as a witness in cases against the Department, all of which constitutes "representing" the Police Department; he advises the executive heads of the Police Department on legal issues, which constitutes "advising management"; and he oversees the Legal Unit's publications, which constitutes a "major assignment." 29 C.F.R. § 541.205(b) (describing functions that typify "administrative" exemption). Over 90% of his time is spent either dispensing legal advice to the police department or coordinating the department's defense by other attorneys. The former task involves "analyzing data and drawing conclusions" as well as "making recommendations." *See Shockley v. City of Newport News*, 997 F.2d 18, 28 (4th Cir.1993) (police officer whose primary duty was investigating complaints against other officers by analyzing facts, interpreting policy, and making recommendations was exempt administrative employee). The latter involves "representing" the department and "negotiating" on its behalf. *See Dambreville v. Boston*, 945 F.Supp. 384, 387 (D.Mass. 1996) (Collings, M.J.) (police detective who worked as neighborhood liaison for mayor was exempt administrator).

■ Finally, Kavanagh qualifies for the "executive" exemption because he super-

vises the Legal Unit with virtually no supervision. *See* 29 C.F.R. § 541.102 ("In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.").

### B. *The State Law Claim*

■ Under A.R.S. § 23–392(A), a person "engaged in law enforcement" is entitled to overtime compensation at the rate of either time-and-a-half if they are non-exempt under the Act or hour-for-hour if they are exempt under the Act. The only exception to this requirement is for persons employed in a bona fide executive or administrative capacity as defined by the employer. *See* A.R.S. § 23–392(B). The City defines "executive or administrative capacity" as those terms are used under the Act. Thus, because Kavanagh qualifies as an "executive or administrative" employee under the Act, he is not entitled to any overtime compensation.

If Edwards qualifies as a "professional" employee under the Act, but not an "executive or administrative" employee, he is entitled to overtime compensation at an hour-for-hour rate under Arizona state law. If, however, he qualifies as an "executive or administrative" employee under the Act (in addition to being a "professional" employee, *see supra* Section III[A]), he is not entitled to any overtime compensation.

■ Edwards is an "administrative" employee under the Act. Over 90% of his time is spent either dispensing legal advice to the police department or lobbying on its behalf to state legislators. The former task involves "analyzing data and drawing conclusions" as well as "making recommendations." *See Shockley*, 997 F.2d at 28. The latter involves "representing" the department and "negotiating" on its behalf. *See Dambreville*, 945 F.Supp. at 393. Edwards also briefs the Police Department's executive staff on legislation, a function that constitutes "advising management." *See Spinden v. GS Roofing*

*Products Co.*, 94 F.3d 421, 428 (8th Cir. 1996) (plant controller whose job duties included participating in management meetings was exempt administrator). For these reasons, the Court rules that Edwards is an "administrative" employee under the Act.

### C. *The Contract Claim*

Kavanagh alleges that a contract for employment was formed between himself and the City on July 25, 1994 when he accepted the position of Lieutenant, Law Specialist. *See* Kavanagh Statement of Facts at ¶ 22 ("Kavanagh SOF"). The undisputed facts show that two years after it hired Kavanagh to be a Law Specialist the City determined that it had incorrectly placed him at Step 6 rather than Step 3 of the pay scale. The City then decided not to grant Kavanagh future merit pay increases until such time as Kavanagh would have attained his current pay level if originally placed at Step 3 rather than Step 6. Kavanagh claims that this action constitutes a breach of the implied understanding between the parties that Kavanagh would receive regular merit pay increases under the employment contract.

In order to demonstrate an implied promise of continued merit pay increases, Kavanagh must show evidence of such intent "in the circumstances surrounding the employment relationship," including evidence such as assurances in personnel manuals or oral promises made by someone with authority to bind the City. *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 376, 710 P.2d 1025 (1985). Kavanagh offers the testimony of former Police Chief Dennis Garrett ("Garrett") who states that he believes Kavanagh should have been placed at Step 6 and thus the City's unilateral decision to freeze him at Step 7 was unwarranted. *See* Kavanagh Mem. at Ex. C. Kavanagh also notes that the City granted 24,598 merit increases between January, 1995 and August, 1999, and only denied 212. Of those 212, Kavanagh states on information and belief that

none involved an employee whose performance evaluation was satisfactory, as was Kavanagh's. *See* Kavanagh Supplement Statement of Facts at ¶ 4. Finally, Kavanagh offers evidence that two former officers who became Law Specialists received substantial promotions upon beginning their tenure as Law Specialists, thereby raising the inference that Kavanagh's placement at Step 6 rather than Step 3 was appropriate. *See id.* at ¶¶ 7–16.

■ Because Kavanagh's employment was of indefinite duration, it is presumed under Arizona law to have been a contract for employment at-will. *See Wagner v. City of Globe,* 150 Ariz. 82, 84, 722 P.2d 250 (1986); *Leikvold v. Valley View Community Hosp.,* 141 Ariz. 544, 546, 688 P.2d 170 (1984). As such, the City is ordinarily thought to be under no obligation to continue granting Kavanagh wage increases throughout his employment. Indeed, the City could have reduced his wage or terminated Kavanagh at any time, subject only to the limitation that it pay Kavanagh for work already performed. *See Demasse v. ITT Corp.,* 194 Ariz. 500, 984 P.2d 1138, 1142–43 (1999) (en banc). Nevertheless, "Arizona recognizes that implied-in-fact contract terms may create an exception to employment that is completely at will." *Id.* at 1143. In other words, the employee may "overcome [the at-will] presumption by establishing a contract term that is either expressed or inferred from the words or conduct of the parties." *Id.*

Kavanagh believes that he has raised a triable issue of fact with respect to whether the City ever impliedly promised that he would receive merit increases throughout the duration of his employment. Admittedly, Kavanagh has offered evidence that the City's practice is to offer merit increases so long as the employee's performance is satisfactory. Even if this conduct suffices to establish an implied promise by the City, however, the promise is superseded by the parties' *express* conduct. At the time the City was grappling with its perceived accounting error, Kavanagh was brought in to discuss the mat-

ter before Zins, Kundin, and Bakin. *See* City SOF (Kavanagh) at ¶ 63. They informed him of their intent to withhold merit pay increases until such time as he would have reached Step 7 of the pay scale had he begun at Step 3. Kavanagh admits that he did not seek to appeal this decision to the City Manager or any other decision-maker. *See id.* at ¶ 62. Instead, he continued working for approximately two years until finally commencing this suit alleging breach of contract.

■ Under the law of Arizona, this conduct of the parties was sufficient to alter the terms of the parties' agreement, even if it did originally include an implied promise by the City that it would grant regular pay increases:

> At-will employment contracts are unilateral and typically start with an employer's offer of a wage in exchange for work performed; subsequent performance by the employee provides consideration to create the contract. *See Wagner v. City of Globe,* 150 Ariz. 82, 85, 722 P.2d 250, 253 (1986) (*citing* 1A A. Corbin, Corbin on Contracts § 152, at 13–14 [1963]). Thus, before performance is rendered, the offer can be modified by the employer's unilateral withdrawal of the old offer and substitution of a new one: the employer makes a new offer with different terms and the employee again accepts the new offer by performance (such as continued employment). Thus a new unilateral contract is formed—a day's work for a day's wages. *See id.; Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626–27 (Minn.1983); *see also Mattison v. Johnston,* 152 Ariz. 109, 112, 730 P.2d 286, 289 (Ariz.App.1986). But the parties are free to create a different relationship beyond one at will "and define the parameters of that relationship, based upon the totality of their statements and actions." *Wagner,* 150 Ariz. at 86, 722 P.2d at 254.

*Demasse,* 984 P.2d at 1142–43. Thus, even assuming that Kavanagh is correct to conclude that his employment originally con-

tained an implied promise of regular merit pay increases, that promise was superseded in May, 1996, when the City offered Kavanagh continued employment on different terms.[5] Moreover, his continued performance over the next two years constitutes unequivocal evidence of acceptance of those new terms.

It is important to note that there is nothing unconscionable or unfair about this arrangement. The City determined that it had mistakenly placed Kavanagh at a higher rung of the pay ladder than he should have been. Rather than seek to recoup the extra $17,000 of pay, the City offered Kavanagh continued employment at Step 7 of the pay scale without merit increases, until such time as he would have reached Step 7 without the City's alleged error in placing him at Step 6 in 1994. Kavanagh manifested his acceptance of this offer by not seeking further review by the City Manager and by continuing his employment for two years, until the filing of this lawsuit.

### D. *The Section 1983 Claim*

 Kavanagh claims that the City deprived him of property without due process of law when it decided temporarily to withhold future merit pay increases. Kavanagh does not, however, have a constitutionally protected property interest in *future* merit pay increases. *See Veit v. Heckler*, 746 F.2d 508, 511 (9th Cir.1984) (federal employee had no property interest in future pay increases); *compare Sanchez v. City of Santa Ana*, 915 F.2d 424, 429 (9th Cir.1990) (municipal employee had protected property interest in continued receipt of merit pay increase that had already been granted). Even if Kavanagh could demonstrate some cognizable state property right in future merit pay increases, the right was extinguished when the parties altered the terms of the employ-

ment relationship. *See Demasse*, 984 P.2d at 1143.

### E. *The Pay Scale Issue*

Edwards attempts to raise an issue regarding his placement at Step 3 of the City's pay scale rather than Step 6 when he became a Law Specialist. *See* Edwards Mem. at 2. He does not state any claim based upon this assertion. Instead, he simply charges in the complaint that his damages under the Act should be calculated at the higher pay scale rate. Given the vagueness of this allegation and the complete failure to correlate it to a cause of action, the Court deems it waived.

### IV. *Conclusion*

For the foregoing reasons, the Court orders that, upon the trial of these cases upon stipulated facts, judgment shall enter for the City of Phoenix. The cross motions for summary judgment, docket nos. 34 and 36 in each case, are, accordingly, DENIED as moot.

**5.** This offer of altered terms was proper because the parties never had an agreement, express or implied, to a guaranteed duration of employment on the original terms. *Compare Demasse*, 984 P.2d at 1143 ("When employment circumstances offer a term of job security to an employee who might otherwise be dischargeable at will and the employee acts in response to that promise, the employment relationship is no longer at will but is instead governed by the terms of the contract.").